**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEGAL AID CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 1:23-cv-4809 |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| HUNTER PROPERTIES, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Legal Aid Chicago, through its undersigned attorneys, brings this complaint for declaratory and injunctive relief and damages and in support alleges as follows:

## INTRODUCTION

1.    Defendant Hunter Properties, Inc. ("Hunter"), which manages more than 2,500 apartments in Chicago, is one of the many landlords across the country that are using discriminatory policies to categorically reject housing applicants who have *ever* found themselves connected with an eviction case. Such practices shut families out of housing opportunities without any legitimate basis. For example, the eviction case—which a landlord files unilaterally—may have never proceeded to a judgment because the landlord withdrew it, or because the court dismissed the case for lack of cause. The eviction case may be from many years ago when the applicant had a different job, different financial obligations, or otherwise materially different financial circumstances. The prior eviction case may have been filed against a tenant who now has a voucher guaranteeing the payment of rent. None of these situations provides a landlord with reliable information about a housing applicant's current

ability to be a good tenant, yet all of these eviction cases preclude housing under a "No-Evictions Policy."[1]

2.      Defendant Hunter applies a No-Evictions Policy to categorically exclude would-be tenants who have any history of an eviction case against them, even if that eviction case did not result in an adverse judgment, regardless of how long ago the eviction case may have occurred, and irrespective of a tenant's current ability to pay rent or otherwise fulfill the terms of a residential lease. Hunter's policy is so broad that even tenants who have won their eviction cases will be automatically denied. Under Hunter's policy, the eviction filing *alone* is an automatic basis for denial, regardless of the ultimate outcome.

3.      Policies that categorically deny housing based on past evictions, like Hunter's No-Evictions Policy, disproportionately affect Black people, and impose their harshest impacts on Black women and their families. As scholar Matthew Desmond explained, "[i]f incarceration has become typical in the lives of men from impoverished black neighborhoods, eviction has become typical in the lives of women from these neighborhoods . . . [i]n inner-city neighborhoods, it is women who disproportionately face eviction's fallout."[2] Little has changed over the past decade.

4.      Research shows that 1 in 5 Black women will experience eviction in their lifetime, compared to 1 in 15 white women.[3] In addition, families with children are three times

---

[1] In this Complaint, we use the term "No-Evictions Policy" to encompass the policies and practices of Hunter (and other landlords) that categorically reject prospective tenants with any connection to a past eviction, including, for example, those who: (1) respond affirmatively to an application question about prior eviction (without the landlord defining what counts as "eviction" or providing an opportunity to explain the circumstances of the "eviction"); (2) are identified by a tenant screening service as having a prior eviction case or filing (even where that report is based on erroneous information, out-of-date records that should no longer be transmitted pursuant to federal law, or records that a court ordered to be sealed); or (3) are identified by other similar practices (*e.g.*, contacting prior landlords) as having a connection to a past eviction.

[2] Matthew Desmond, *Eviction and the Reproduction of Urban Poverty*, 118 AM. J. SOCIOLOGY 88, 91 (July 2012).

[3] Jaboa Lake and Leni Tupper, *Eviction Record Expungement Can Remove Barriers to Stable Housing*, CENTER FOR AMERICAN PROGRESS (Sept. 30, 2021)

more likely to be evicted than families without children, and Black children are twice as likely to experience eviction as white children.[4]

5.      These race- and sex-based disparities hold true in Cook County. Black renters consistently experience the highest rates of eviction cases. Black people of all genders make up just 33% of Cook County renters, but were approximately 56% of the individuals from September 2010 to March 2023 who were either served with an eviction case by the Cook County Sheriff's Office or evicted by the Sheriff's Office pursuant to a judgment. Black women alone were approximately 33% of the individuals served with an eviction case or evicted during this period.

6.      Just as restrictive racial covenants and the redlining of Black neighborhoods were the cornerstones of housing discrimination in the 20th century, the exclusion of tenants with eviction cases against them today reinforces and expands widespread discrimination in housing. These practices have had, and continue to have, a profound impact on creating and sustaining racial segregation throughout Cook County.

7.      Because Black people, and Black women in particular, are significantly more likely to be sued in an eviction action than their white counterparts, a landlord's policy of rejecting housing applicants who have been subject to an eviction filing has a disproportionate impact on Black people, and particularly on Black women. When a landlord applies a No-Evictions Policy, without regard to the circumstances or even the outcome of the past eviction case, there is no substantial, legitimate non-discriminatory justification.

_____

https://www.americanprogress.org/article/eviction-record-expungement-can-remove-barriers-stable-housing/ (citing Robert Collinson and Davin Reed, *The Effects of Evictions on Low-Income Households*, NYU Law 1 (Dec. 2018), https://www.law.nyu.edu/sites/default/files/upload_documents/evictions_collinson_reed.pdf).

[4] *See* Emily A. Benfer *U.S. Eviction Policy is Harming Children: The Case for Sustainable Eviction Prevention to Promote Health Equity*, HARV. LAW PETRIE-FLOM CENTER (Nov. 2, 2022), https://blog.petrieflom.law.harvard.edu/2022/11/02/pandemic-eviction-policy-children/.

8.      Each time a landlord files an eviction case in court, a public record is created. Any member of the public can find this public record of the filing, including any property owner, property management company, or tenant screening service. Significantly, the record of the filing itself remains available even where the court later dismissed the case, or the landlord decided to voluntarily dismiss it, or no eviction judgment or order was ever entered against the tenant. And the records are available for years, permitting the public to access eviction filings for individuals whose circumstances changed long ago.

9.      The federal government has sounded the alarm on problematic eviction records screening practices. For example, in November 2022 the Consumer Financial Protection Bureau ("CFPB") issued two reports highlighting the many harmful consequences of using eviction history and tenant screening services in making housing decisions.[5] The CFPB pointed to findings that 22% of eviction court records contained misleading or erroneous information.[6] Because landlords do not have to notify prospective tenants before taking adverse action based on a screening report, the onus is on the prospective tenant to review the report and contest the information it contains.[7] As a result, prospective tenants may be denied housing based on an erroneous report of a past eviction of which they are unaware, and in some instances, never learn that the report was the reason for the denial.[8]

---

[5] *See* Consumer Financial Protection Bureau, *Tenant Background Checks Market Report* (Nov. 15, 2022), https://files.consumerfinance.gov/f/documents/cfpb_tenant-background-checks-market_report_2022-11.pdf; Consumer Financial Protection Bureau, *Consumer Snapshot: Tenant Background Checks* (Nov. 15, 2022), https://files.consumerfinance.gov/f/documents/cfpb_consumer-snapshot-tenant-background-check_2022-11.pdf.

[6] *See* CFPB, *Tenant Background Checks*, *supra* at 1-2; *id.* at 14 n.46 (17 screening companies that CFPB reviewed offered evictions history screening "as part of their standard package or for a relatively small additional fee").

[7] *See* CFPB, *Consumer Snapshot*, *supra* at 10, 24.

[8] *See* CFPB, *Consumer Snapshot*, *supra* at 10 ("The FCRA requires landlords to provide an adverse action notice to an applicant if they are denied or required to take on lease terms that are not required of others due to information in a screening report. . . . However, interviews and complaints indicate that landlords do not always provide the legally required adverse action notice. As such, consumers, may be

10.     The CFPB found that reports of evictions may not reflect the reasons behind the eviction filing or the ultimate disposition of the eviction case.[9] Landlords may initiate evictions as retaliation against tenants who assert their legal rights, tenants who demand repairs, or as an intimidation tactic against sexual harassment victims.[10] Additionally, prospective tenants may have eviction cases that were dismissed, vacated, or sealed that still show up in their tenant screening report.[11] Prospective tenants may also have experienced a change in circumstances since the eviction case was filed, such as a change in job or financial obligations. Regardless, any individual with an eviction on their screening report would be denied housing under a blanket No-Evictions Policy.

11.     The U.S. Federal Trade Commission acknowledges these problems with screening reports as well. That agency has filed complaints against screening companies for creating eviction reports without reconciling inaccurate or misleading information. The FTC recognizes the negative and unjustified impact that using such faulty eviction reports has on prospective tenants.[12]

12.     CFPB has recognized that the use of eviction history to deny housing has the largest harmful impact on Black women. According to the CFPB, "Black women are more likely than any other demographic to be evicted, with some evidence suggesting that this holds constant after controlling for failure to pay rent."[13] The CFPB cited to national statistics indicating 15.9% more women are evicted annually than men; Black people experience

---

unaware of how to obtain the report used, figure out the reason they were denied, and dispute information that is inaccurate.").

[9] *See* CFPB, *Tenant Background Checks*, *supra* at 30.

[10] *See* CFPB, *Consumer Snapshot*, *supra* at 13.

[11] *See* CFPB, *Tenant Background Checks*, *supra* at 32.

[12] *See* Complaint, *U.S. v. AppFolio, Inc.,* 1:20-cv-03563 (D.D.C.), Filed Dec. 8, 2020 (AppFolio settled with the Federal Trade Commission (FTC) for allegedly failing to check whether court records purchased from a third party and used in tenant screening reports had been sealed).

[13] CFPB, *Tenant Background Checks*, *supra* at 34.

eviction at rates more that 50% higher than White people, with Black women facing an eviction filing at nearly twice the rate of White women; and 36.3% more Black women than Black men are evicted annually.[14] These disparities, with the highest rates of evictions being suffered by Black women, hold true in Cook County. *See* Section II.

13. Upon information and belief, Hunter implements its No-Evictions Policy by seeking and considering information even about eviction records that have been sealed by court order. Under Illinois law, a court has the discretion to seal from public view the records of eviction cases that lack a sufficient basis in fact or law. When applied as intended, this sealing law can chip away at the devastating impact of an eviction record, but it still does not fully solve the problem, as far too few tenants have the resources required to pursue this remedy in court. Moreover, even when an eviction record is sealed, Hunter appears to find ways to learn about those eviction cases anyway.

14. Hunter's online housing application requires prospective tenants to answer "yes" or "no" to the question, "Have you ever been evicted?," without providing any explanation of what being evicted means, without stating any exception for long-ago filings or sealed eviction records, and without providing any opportunity to explain surrounding circumstances, present mitigating information, or appeal a denial. On information and belief, Hunter denies housing to all applicants who answer "yes" to that online question.

15. In addition, Hunter engages tenant screening services to provide background checks that screen applicants based on past eviction records, which sometimes include sealed records, without oversight or review of the activities of those services. Hunter then denies housing to all applicants who are matched to eviction records by the third-party tenant screening provider.

---

[14] Peter Hepburn, Renee Louis, and Matthew Desmond, *Racial and Gender Disparities among Evicted Americans*, THE EVICTION LAB, (Dec. 2020), https://evictionlab.org/demographics-of-eviction.

16.     Hunter's blanket No-Evictions Policy has a disparate impact on Black renters, and particularly Black women. Black renters, and particularly Black women, are significantly more likely to have eviction cases filed against them, and thus to be excluded by a No-Evictions Policy. Hunter's policy violates the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a), and the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2, and flies in the face of the key public policies underlying those statutes.

17.     There is no legally sufficient justification for the No-Evictions Policy, which routinely deters, denies, and excludes households who would otherwise be successful tenants. Any legitimate purpose Hunter seeks to accomplish by applying its No-Evictions Policy could be achieved through less-discriminatory alternatives.

18.     Plaintiff Legal Aid Chicago is a leader in the Cook County housing advocacy community and dedicates significant resources to ensuring access to housing for its clients. Legal Aid Chicago works to both address the impacts of eviction filings, by, among other things, defending tenants in eviction cases, and to reform the eviction process by advocating for the equal administration of justice in the Cook County eviction court system. No-Evictions Policies directly undermine the work of Legal Aid Chicago and its efforts to ensure fair housing access.

19.     This action is brought by Legal Aid Chicago to challenge Hunter's unjustifiable No-Evictions Policy that categorically bars would-be tenants who have ever been the subject of an eviction case from rental housing, regardless of whether the case resulted in an eviction judgment, was filed many years ago, was sealed, or involved circumstances (such as unemployment) that are no longer applicable.

**PARTIES**

20.     Plaintiff Legal Aid Chicago is an Illinois legal aid organization that provides free legal services to low income or otherwise vulnerable individuals and families living in

Cook County, Illinois, including, but not limited to, seniors, veterans, people living with HIV, domestic violence survivors, and human trafficking victims.

21.     Defendant Hunter Properties, Inc., is an Illinois corporation with its headquarters at 2057 W. Addison St., Chicago, IL 60618. Hunter manages more than 2,500 apartments across 60 locations in Chicago. Hunter continuously conducts business in Illinois through its management of rental housing units, and this case arises out of Hunter's contacts with Illinois.

## JURISDICTION

22.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 2202, and 42 U.S.C. § 3613(a).

23.     This Court has supplemental jurisdiction over Legal Aid Chicago's state law claim under 28 U.S.C. § 1367.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the claims arose in this District, Hunter is incorporated in this District, and a substantial part of the events giving rise to this action occurred in this District. The principal parties and witnesses are also located in this District. *See* 28 U.S.C. § 1391(b)(1).

## FACTS

I.     **Hunter's No-Evictions Policy results in the deterrence and categorical denial of applicants.**

25.     Defendant Hunter maintains a blanket No-Evictions Policy denying housing based on any prior eviction case, regardless of the circumstances or outcome. This policy is plainly stated on Hunter's website: "Prior evictions filings will result in denial."[15]

---

[15] The screenshots that appear in paragraphs 25-26 of the Complaint show Hunter's online application as of June 27, 2023. *See* https://hunterprop.managebuilding.com/Resident/rental-application/new/apply (accessed June 27, 2023) (highlighting added).

**Terms and Conditions**

Thank you for preparing to submit your application for an apartment with Hunter Properties, Inc. Please read the following information before submitting your application.

All individuals aged 18 or older who intend to live in the apartment must submit a separate application. Hunter Properties, Inc. has a two-step screening process which follows the newly enacted Cook County Just Housing Ordinance and the rules of the Cook County Commission on Human Rights.

Step 1: The first step consists of confirming your ability to pay your rent on time:

Hunter Properties, Inc. will consider your income and employment information; results of a credit check; payment history and any civil judgements; eviction history; rental history and landlord references and other similar information.
Inadequate income or poor credit/payment history will result in denial of the application or will result in a request for a qualified co-signor.
Prior evictions filings will result in denial.
False or misleading statements will result in denial.

26.     Hunter implements this policy in numerous ways that both deter would-be tenants with past evictions from submitting applications, and detect and deny applicants who disclose past eviction cases or who are matched to eviction records, including:

a.     Requiring users of the electronic application form to answer "yes" or "no" to the question "Have you ever been evicted?" without defining "evicted," without stating whether sealed eviction records may be excluded, and without providing any opportunity for an applicant to provide explanatory information or other details about an eviction case. An applicant must answer this question to submit the electronic application—the asterisk shown below indicates that this is a required field for the application—and an untruthful answer also establishes grounds for denial of the application.



b. Engaging tenant screening services to provide background checks that search for and screen applicants based on records of past eviction filings, which may include sealed records;

c. Requiring all adult household members to complete the rental application and submit to the background screening;

d. Requiring an online applicant to disclose the name and phone number of a "current landlord," and also requesting the current landlord's email address, which Hunter may use to inquire about past eviction cases, and

e. Charging a rental application fee of $70 per adult household member.

### Application Fee
**$70.00**

27. On information and belief, Hunter denies admission to all applicants who answer "yes" to the question "Have you ever been evicted?", who are matched to eviction case records by a tenant screening service, or whose involvement in past evictions is discovered through inquiries with past or current landlords.

28. The wording of Hunter's admission criteria and warnings is broad and ambiguous, and no definitions or explanations are provided for terms such as "evicted," "eviction records," "eviction history," "eviction filings," and "prior evictions." This maximizes the deterrent effect—such as by dissuading would-be tenants with dismissed cases or sealed eviction records from applying, or those with eviction records too old to be reported under the Fair Credit Reporting Act (*see* 15 U.S.C. § 1681c(a)(2), limiting the reporting of civil suits to within 7 years of the date of entry). Any applicant who fails to disclose a prior eviction case, even if that failure is simply due to the application's ambiguous wording, then faces an

independent ground for denial under Hunter's policy against the provision of "false" information.

29.     Moreover, Hunter further deters tenants with any connection to a prior eviction case from applying by collecting an up-front $70 per-adult application fee that is not refunded in the event of a denied application, and by providing no opportunity for an applicant to submit explanatory material or otherwise seek review or reconsideration of a denied application.

30.     On information and belief, the number of applicants Hunter formally denies under its No-Evictions Policy represents a small fraction of the potential tenants with prior evictions (including sealed records) who are effectively foreclosed by the policy from Hunter's housing, despite having sufficient resources to afford it and an interest in living there. Many more never apply because they are deterred by Hunter's public-facing descriptions of its policy and the non-refundable, $70 per-adult application fee.

31.     Defendant Hunter also circumvents Illinois law by obtaining information about sealed eviction records—including by inquiring with applicants' past landlords and by requiring online applicants to answer "yes" or "no" to the question "Have you ever been evicted?", without specifying whether sealed evictions are included—and denying housing to applicants on the basis of those sealed cases.

32.     In addition, on information and belief, for at least the last two years through the present, Defendant Hunter has used third-party tenant screening services provided by companies such as CoreLogic, Inc. and/or TransUnion, which report consumer information available from credit reporting bureaus, and other sources, including eviction records, without oversight or review of their activities or practices by Hunter. Upon information and belief, these reports may include records of previous eviction proceedings that have been sealed by court order.

33.     On information and belief, Defendant Hunter applies its No-Evictions Policy when the third-party screening report discloses sealed eviction records, without affording applicants a chance to explain.

## II.     Hunter's No-Evictions Policy is discriminatory.

34.     Black people, and especially Black women, are disproportionally the subject of eviction filings in court. In one national study, Black people made up 19.9% of all adult renters, but 32.7% of all eviction filing defendants. Black renters experienced the highest average rates of eviction filing (6.2%) and eviction judgments (3.4%). By contrast, the average eviction filing rate among white renters was 3.4%, and the average eviction judgment rate was 2.0%. The overrepresentation of Black renters within the population of renters against whom an eviction was filed is particularly pronounced in highly populated counties.[16]

35.     Even greater racial disparities pertain to evictions in Cook County, Illinois. According to an independent analysis of data from the Cook County Sheriff's Office, while Black people of all genders make up just 33% of Cook County renters, Black people were approximately 56% of the individuals from September 2010 to March 2023 who were either served with an eviction case by the Sheriff's Office or evicted by the Sheriff's Office pursuant to a judgment. Eviction rates for Black renters are consistently higher than those for non-Black renters: on average, Black renters in Cook County faced nearly triple the likelihood of experiencing an eviction case than non-Black renters (6.1% vs. 2.3%).

36.     Nationally, experts estimate that approximately 15.9% more women are evicted annually than men.[17]

---

[16] *See* Hepburn et al., *supra* note 14.

[17] *Id.*

37.     Black women in particular disproportionately experience eviction. A national study found that Black women face an eviction filing at almost twice the rate of White women, and that 36.3% more Black women than Black men are evicted annually.[18]

38.     In Cook County, Black women experience eviction more frequently than any other group. From September 2010 to March 2023, Black women alone accounted for approximately 33% of those served with an eviction case or evicted by the Sheriff's Office despite making up just 22% of all renters in Cook County. On average, Black women renters faced a likelihood of experiencing an eviction case of 4.9%, compared to just 3.1% for all other renters. Black women experience a substantially higher likelihood both of having an eviction filing without being evicted and also of either having an eviction filing or being evicted than renters who are not Black women.

39.     On information and belief, Hunter's apartments attract potential tenants from all across Cook County. The renter population of Cook County is therefore a reasonable proxy for the potential applicant pool for Hunter's apartments that is impacted by the No-Evictions Policy, either by the deterrent effect of Hunter's publicly-available statement of its policy on its website or by Hunter's denial of rental applications from anyone with a connection to a prior eviction case.

40.     Hunter's blanket No-Evictions Policy predictably and actually results in the disproportionate denial of housing opportunities to Black renters in Cook County, and especially Black women, both by deterring them from applying and through the rejection of formal applications submitted.

41.     Defendant Hunter's No-Evictions Policy is an arbitrary and unnecessary barrier to housing, and is not necessary to achieve a substantial, legitimate, non-discriminatory interest.

_____

[18] *Id.*

42.     A policy or practice that has a discriminatory effect on Black renters, and especially Black women, violates the FHA unless the policy or practice is necessary to achieve a substantial, legitimate, non-discriminatory interest of the housing provider. But any valid interest Hunter may have for the No-Evictions Policy could be served by another practice with a less discriminatory effect, such as having a policy that distinguishes based on the circumstances and outcomes of past eviction cases, applying a reasonable lookback period to eviction records (so that old cases with little or no bearing on an applicant's current suitability for the tenancy are not considered), and conducting an individualized assessment of each potential tenant.

43.     There is a growing nationwide awareness of the fair housing implications of evictions history screening practices like Hunter's No-Evictions Policy.

44.     The U.S. Department of Housing and Urban Development ("HUD") has issued guidance on the consideration of eviction cases in rental housing applications, stating for example:

> Screening criteria, such as those related to criminal records, credit, and rental history, may operate unjustifiably to exclude people based on their race, color, or national origin . . . [I]n evaluating rental history, housing providers should consider the accuracy, nature, relevance, and recency of negative information rather than having any negative information trigger an automatic denial. For example, records from eviction or related cases in which the tenant prevailed or that were settled without either party admitting fault do not necessarily demonstrate a poor tenant history. Likewise, extenuating or mitigating circumstances may apply (e.g., an eviction was due to unexpected medical or emergency expenses, or a negative reference reflected bias). This is important because non-white households may be more likely to face eviction actions, even for the same housing history as white counterparts.[19]

---

[19]     *See* Office of Fair Housing and Equal Opportunity (FHEO) Guidance on Compliance with Title VI of the Civil Rights Act in Marketing and Application Processing at Subsidized Multifamily Properties (Apr. 21, 2022), https://www.hud.gov/sites/dfiles/FHEO/documents/HUD%20Title%20VI%20Guidance%20 Multifamily%20Marketing%20and%20Application%20Processing.pdf

**III.    Legal Aid Chicago focuses its mission and resources on eviction defense and tenant advocacy.**

45.    Since 1973, Legal Aid Chicago has been a leader in the Cook County tenant advocacy community, representing hundreds of clients in eviction matters each year—the most of any legal aid program in Cook County. Legal Aid Chicago also educates tenants, landlords, judges and advocates on eviction law and proceedings and advocates for the equal administration of justice in the Cook County eviction court system. Legal Aid Chicago dedicates significant resources to ensuring fair access to housing and defending tenants in eviction cases.

46.    Currently, Legal Aid Chicago's housing practice group consists of 28 people. The demand for eviction defense services dramatically exceeds Legal Aid Chicago's capacity. Legal Aid Chicago's eviction defense practice represents, on average, approximately 450 tenants each year. Approximately 30,000 eviction cases are filed in Cook County each year.

47.    Legal Aid Chicago's housing practice group represents tenants in eviction cases at all stages beginning with the service of a notice of termination or court summons, through motion practice and the discovery process, and continuing to trial and appeals. Legal Aid Chicago's staff litigates these cases, including investigating the facts, evaluating the merits of a case, identifying defenses and counterclaims, negotiating with landlords and the eviction plaintiffs' bar to avoid evictions, and going to trial.

48.    Legal Aid Chicago also operates a Fair Housing Investigation and Enforcement Project pursuant to a grant from the United States Department of Housing and Urban Development. Its team of eight attorneys, two paralegals, and a fair housing testing coordinator fight cases of alleged discrimination, including conducting investigations into landlords' housing practices, deploying fair housing testers, and filing cases to enforce local, county, state and federal fair housing laws. Legal Aid Chicago has represented clients in almost 400 of these cases since it first began operating the Project in July 2020.

49.     Legal Aid Chicago receives more complaints about potential housing discrimination than it has the resources to investigate.

50.     Legal Aid Chicago also provides a number of services through the Comprehensive Legal Assistance for Survivors Project ("CLASP"). Among its services, CLASP protects survivors of domestic violence and sexual assault from eviction or the loss of their housing. Frequently, CLASP supports survivors who are being threatened with eviction, or have had an eviction proceeding filed against them, because of that status or the violent crimes committed against them. In one study, residents of Black neighborhoods who were experiencing domestic violence were over three times more likely to be threatened with eviction than residents of white neighborhoods who were experiencing domestic violence.[20]

51.     Examples of Legal Aid Chicago's advocacy work for tenants' rights span decades. In the mid-1980s, after working for years representing tenants who were forced into eviction court despite viable legal defenses and counterclaims, Legal Aid Chicago (then the Legal Assistance Foundation of Metropolitan Chicago) drafted and advocated for a municipal residential landlord tenant ordinance, which became the Residential Landlord Tenant Ordinance ("RLTO"). Chicago adopted the RLTO, one of the most progressive local landlord-tenant ordinances in the country, in 1986.

52.     Among other provisions, the RLTO guarantees tenants the opportunity to cure certain lease violations, such as by paying for damages to the unit caused by the tenant, or removing an unauthorized pet. The RLTO also establishes maximum late fees on rental payments, provides protection against extra-judicial lockouts, requires the return of tenants' security deposits other than withholding for unpaid rent or the cost of repairing damage beyond normal wear and tear, and allows only tenants to recover attorneys' fees for violation of the

---

[20] Matthew Desmond and Nicol Valdez, *Unpolicing the Urban Poor: Consequences of Third-Party Policing for Inner City Women*, (2012), https://scholar.harvard.edu/files/mdesmond/files/desmond.valdez.unpolicing.asr__0.pdf.

ordinance, thereby incentivizing private attorneys to defend meritorious cases. Legal Aid Chicago attorneys rely on the RLTO every day in their eviction defense practice.

53.     Legal Aid Chicago's housing practice group has also dedicated substantial time, staffing, and resources to improving the administration of justice in eviction court. For instance, Legal Aid Chicago successfully advocated for the enforcement of Illinois Supreme Court rules in eviction court, which, among other things, require landlords to attach all relevant documents to their complaints, as is required of any other plaintiff in a civil matter.

54.     As a result of Legal Aid Chicago's advocacy, the Illinois Supreme Court Access to Justice Commission created a subcommittee to implement plain-language forms in eviction courts, which Legal Aid Chicago helped to draft.

55.     The Illinois legislature also adopted 735 ILCS 5/9-109.6 which requires the use of a plain-language eviction order drafted by Legal Aid Chicago to help ensure tenants facing eviction understand that fact.

56.     Legal Aid Chicago worked with other organizations and the office of the Chief Judge of the Circuit Court of Cook County to implement, in 2020, an Early Resolution Program, through which tenants may access an attorney who provides guidance on the eviction process. Since 2020, and continuing to the present, Legal Aid Chicago housing attorneys have accepted cases through the Early Resolution Program and worked with stakeholders to keep the Program operating successfully.

57.     Legal Aid Chicago successfully advocated for the implementation of recording devices in eviction courtrooms in Cook County, authored significant portions of the Eviction Bench Book used by Cook County Judges, and regularly provides training and education to judges, other lawyers, landlords, and tenants on the eviction court laws and processes.

58.     Subsidized housing is a particular focus of Legal Aid Chicago's eviction defense practice. For tenants in subsidized housing units, the legal issues are often more

complicated because of the complex rules and regulations relating to subsidy programs. And the consequences of an eviction are often more dire; many subsidized housing tenants become homeless when they lose their affordable housing.

59.     As part of its tenant advocacy, Legal Aid Chicago has provided public comments on annual subsidy administration plans prepared by different housing authorities, including the Housing Authority of Cook County, with the goal of reducing the likelihood that subsidies are terminated or eviction cases filed.

60.     Legal Aid Chicago assists tenants with obtaining federal, state and local housing subsidies to help ensure that they are able to pay their rent, so that eviction cases either will not be brought in the first instance or will be dropped by landlords.

61.     In addition to representing its clients in appeals of their own cases, Legal Aid Chicago files amicus briefs advocating for tenants' rights in appellate courts, including briefs related to unjust evictions for being a survivor of domestic violence, for being arrested but not convicted, and for a judge not recognizing proper counterclaims and affirmative defenses. As with its other activities, the goal of these amicus briefs is to reduce the number of eviction filings and judgments and preserve housing opportunities for low-income tenants.

62.     In an effort to mitigate the negative effects that an eviction case has on future housing access, Legal Aid Chicago also expends significant resources to assist clients in having their eviction records sealed and to educate advocates, lawyers, and tenants on Illinois eviction sealing laws.

63.     Illinois law permits tenants to seal their eviction records in certain limited circumstances. Under Illinois statute, 735 ILCS 5/9-121(b), a court has discretion to place the court's records under seal upon finding that the case lacked a basis in fact or law, that placing the records under seal is in the interests of justice, and that these interests are not outweighed by the public's interest in knowing about the case. Because sealings under Subsection (b) are

not mandatory or automatic, Legal Aid Chicago spends considerable time arguing that its clients' eviction records are eligible for sealing.[21]

64.     In summary, Legal Aid Chicago's housing practice does all this work to ensure low-income tenants have fair access to housing and to prevent more families from experiencing housing instability or homelessness.

## IV.     Hunter's No-Evictions Policy injures Legal Aid Chicago by frustrating its mission and leading to diversion of its resources.

65.     Hunter's No-Evictions Policy has injured and continues to injure Legal Aid Chicago by frustrating its mission of, and diverting its limited resources from, maximizing low-income Cook County residents' access to safe, decent and affordable housing, including by preventing and reducing the impacts of evictions. In addition, Hunter's No-Evictions Policy undermines the purpose of the sealing provisions set out in 735 ILCS 5/9-121 and of Legal Aid Chicago's work to seal eviction records.

66.     Legal Aid Chicago has had to use staff time and financial resources to obtain information through Freedom of Information Act requests to assess the discriminatory harm caused by Hunter's actions. Legal Aid Chicago also has had to counteract Hunter's discriminatory actions with the following activities: representing tenants in seeking to seal *all* types of eviction records (for example, even those that are old or did not result in any judgment against the tenant); providing training and education to tenants, landlords, and others on the harms and discriminatory impact of denying prospective renters on the basis of eviction records; pursuing more cases through to trial so that a tenant can show that they won their eviction case; resolving threatened evictions when tenants receive a notice of termination of tenancy prior to an eviction case being filed; and investigating and bringing this case against

---

[21]     In certain circumstances, Illinois statute 735 ILCS 5/9-121(c) makes sealing mandatory, including when a tenant was evicted following a foreclosure proceeding against the landlord, or when the eviction occurred during the COVID-19 eviction moratorium. The automatic sealing of COVID-related evictions expired on March 31, 2022. 735 ILCS 5/9-122.

Hunter. If not for Hunter's discriminatory, blanket No-Evictions Policy, Legal Aid Chicago could have devoted more of its resources to representing more low-income tenants in eviction cases and to otherwise achieving its broader goals regarding the administration of justice in eviction court and maximizing low-income Cook County residents' access to safe, decent and affordable housing.

67. Over the last five years, Legal Aid Chicago has devoted its resources to more than 800 sealing cases. Even the simplest cases, where the landlord does not oppose sealing, can take as many as ten hours of attorney time. Difficult, contested cases require far more resources. Legal Aid Chicago has devoted thousands of hours to sealing eviction cases in the last several years. On information and belief, Hunter considers even sealed eviction records as a basis for categorically denying housing under its No-Evictions Policy, which frustrates Legal Aid Chicago's work to ensure that eviction records are lawfully sealed and not used to exclude tenants from housing.

68. Because of No-Evictions Policies like Hunter's, Legal Aid Chicago has to advise clients facing the possible threat of a soon-to-be filed eviction case—even those who would ultimately succeed in defending against such a case—on the difficulty of finding new housing with a history of an eviction filing. Upon hearing this information, clients often decide they are better off moving out to avoid acquiring an eviction record, even though they have valid defenses—for example, reasonable accommodation defenses or defenses based on being a survivor of domestic violence—and would prefer to remain in their homes. In this additional way, Hunter's No-Evictions Policy therefore frustrates Legal Aid Chicago's mission to prevent evictions and displacement, and ensure fair access to housing.

69. Legal Aid Chicago has also suffered actual damages because of Hunter's No-Evictions Policy, given the economic value of the resources that Legal Aid Chicago was forced to divert and of the mission that Hunter's policy frustrates.

70. Any legitimate business objectives served by Hunter's policy could be equally accomplished through an eviction history screening policy that considered only recent, publicly-available eviction cases in which the tenant was found culpable, with an opportunity for an applicant to present evidence of changed circumstances or other mitigating information.

71. Hunter's policy and practice of categorically excluding tenants with any prior eviction cases is injurious to tenants because they deter, and deny housing to, would-be tenants who would otherwise live successfully in housing rented out by Hunter.

### COUNT I

### Race Discrimination in Violation of the Fair Housing Act
### (42 U.S.C. § 3604)

72. Legal Aid Chicago realleges and incorporates all foregoing allegations into this section.

73. The FHA prohibits discrimination in rental housing on the basis of race including by refusing to rent, refusing to negotiate for the rental of property, or otherwise making unavailable or denying a dwelling to a person because of race. *See* 42 U.S.C. § 3604(a).

74. Hunter's No-Evictions Policy violates 42 U.S.C. § 3604(a) by discriminating on the basis of race. Hunter makes unavailable rental dwellings because it refuses to receive or process applications for the rental of dwelling units, and deters would-be applicants, by stating its policy of categorically refusing applicants with any prior eviction cases. Hunter's policy also denies housing by categorically rejecting applicants based on any connection to a prior eviction and by engaging a third-party tenant screening service without guidance, oversight or review of its practices in obtaining eviction records. This policy has an unjustified disparate impact on Black renters, who are significantly more likely to have been sued in an eviction case than other renters in the pool of potential applicants to Hunter's rental properties. By following this policy, Hunter disproportionately makes unavailable and denies housing opportunities to Black people in Cook County.

75.     Hunter's No-Evictions Policy is not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## COUNT II

**Race and Sex Discrimination in Violation of the Fair Housing Act**
**(42 U.S.C. § 3604)**

76.     Legal Aid Chicago realleges and incorporates all foregoing allegations into this section.

77.     The FHA prohibits discrimination in rental housing on the basis of race and sex including by refusing to rent, refusing to negotiate for the rental of property, or otherwise denying a dwelling to a person because of race and sex. *See* 42 U.S.C. § 3604(a).

78.     Hunter's No-Evictions Policy violates 42 U.S.C. § 3604(a) by discriminating on the basis of race and sex. Hunter makes unavailable rental dwellings because it refuses to receive or process applications for the rental of dwelling units, and deters would-be applicants, by stating its policy of categorically refusing to admit tenants with any prior eviction cases. Hunter's policy also denies housing by categorically rejecting applicants based on any connection to a prior eviction and by engaging a third-party tenant screening service without guidance, oversight or review of its practices in obtaining eviction records. This policy has an unjustified disparate impact on Black women, who are significantly more likely to have been sued in an eviction case than other renters in the pool of potential applicants to Hunter's rental properties. By following this policy, Hunter disproportionately makes unavailable and denies housing opportunities to Black women in Cook County.

79.     Hunter's No-Evictions Policy is not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## COUNT III

**Unfair Residential Leasing in Violation of the**
**Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2)**

80.     Legal Aid Chicago realleges and incorporates all foregoing allegations into this section.

81.     Hunter's policy of disqualifying all prospective tenants with any prior eviction, and its broad and far-reaching methods of implementing that policy, is an unfair business practice because the practice offends public policy, is immoral, unethical, oppressive, and/or unscrupulous, and injures consumers.

82.     Illinois, along with other states and cities, has passed statutes enabling tenants to seal eviction case records in certain circumstances so as to protect their access to rental housing. *See*, *e.g.,* 735 ILCS 5/9-121 (authorizing eviction record sealing by discretion where "action is sufficiently without a basis in fact or law" and mandating sealing of certain post-foreclosure evictions). Hunter undermines this public policy by inquiring into and denying rental housing because of sealed eviction records, by deterring would-be tenants with sealed eviction records from even applying for its housing, and by engaging a third-party tenant screening service without guidance, oversight or review of its practices in obtaining eviction records.

83.     Hunter violates public policy because excluding would-be tenants with any prior eviction cases contributes to housing insecurity and homelessness, contrary to public policies embedded in multiple Illinois laws such as the Homelessness Prevention Act, 310 ILCS 70/1.

84.     Because Black renters, and especially Black women, are disproportionately more likely to have been sued in an eviction case, excluding such tenants has discriminatory impacts, contrary to public policies reflected in statutes such as the federal FHA, 42 U.S.C. § 3604, and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*.

85.     A policy excluding tenants based on the existence of any prior eviction case tends to deter tenants with valid defenses to eviction from appearing in court and defending

23

Case: 1:23-cv-04809 Document #: 1 Filed: 07/25/23 Page 24 of 25 PageID #:24

themselves, a dynamic which undermines the right to procedural due process and impedes state courts from hearing, deciding, and according full and proper relief in eviction matters.

86.     Hunter's No-Evictions Policy of excluding tenants with any prior eviction case is immoral, unethical, oppressive, and or unscrupulous because Hunter's policy and practices are designed to deter and exclude, and do deter and exclude, would-be tenants with eviction cases that were dismissed or otherwise resolved in the tenant's favor, that were sealed or otherwise made of limited dissemination, that took place many years ago, that were filed based on the acts or omissions of persons who would not be part of the prospective tenant household, or that otherwise lack meaningful predictive value about the suitability of the would-be tenant.

87.     Accordingly, Hunter's categorical No-Evictions Policy constitutes an unfair act or practice in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

### PRAYER FOR RELEF

Wherefore, Legal Aid Chicago requests that this Court:

A.     Declare that Hunter's categorical No-Evictions Policy is unlawful due to its unjustified discriminatory effect on Black renters in Cook County, and on Black women in particular, in violation of Section 3604(a) of the Fair Housing Act;

B.     Declare that Hunter's categorical No-Evictions Policy constitutes an unfair business practice that violates public policy, is immoral, unethical, oppressive, and or unscrupulous, and is injurious to consumers. in violation of Section 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act.

C.     Permanently enjoin Hunter from continuing its No-Evictions Policy;

D.     Award Legal Aid Chicago all compensatory or punitive damages to which it may be entitled, as well as the costs of suit, including reasonable attorney fees;

E.     Award any additional relief that the Court may deem just and appropriate.

Dated: July 25, 2023

By:/s/ Brian J. Massengill
Brian J. Massengill
Megan E. Stride
Julia M. Petsche (admission forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-783-0600
bmassengill@mayerbrown.com
mstride@mayerbrown.com
jpetsche@mayerbrown.com

Sandra S. Park
American Civil Liberties Union
Women's Rights Project
125 Broad St. 18th Fl.
New York, NY 10004
Tel: 212-549-2500
spark@aclu.org

Ameri R. Klafeta
Emily Werth
Roger Baldwin Foundation of ACLU, Inc.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Tel: 312-201-9740
aklafeta@aclu-il.org
ewerth@aclu-il.org

Eric Dunn (admission forthcoming)
Katherine E. Walz
National Housing Law Project
1663 Mission St., Suite 460
San Francisco, CA 94103
Tel: 415-546-7000
edunn@nhlp.org
kwalz@nhlp.org

*Counsel for Plaintiff Legal Aid Chicago*