**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEGAL AID CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:23-cv-4809 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HUNTER PROPERTIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**LEGAL AID CHICAGO'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION..........................................................................................................1

STATEMENT OF FACTS.........................................................................................1

    A.    Hunter's No-Evictions Policy ..............................................................1

    B.    Discriminatory Impact of Hunter's No-Evictions Policy.........................2

    C.    Injury to Legal Aid Chicago from Hunter's No-Evictions Policy ...........3

    D.    Legal Aid Chicago's Complaint ................................................................4

LEGAL STANDARD ...............................................................................................5

ARGUMENT .............................................................................................................5

I.    **Legal Aid Chicago has standing to bring this action.** ....................................5

    A.    Legal Aid Chicago alleges that its injuries were fairly traceable to and proximately caused by Hunter's policies and practices....................................7

    B.    Hunter's purported factual challenges to jurisdiction should be rejected. ...............9

    C.    Legal Aid Chicago's injuries are redressable by the Court...................10

II.    **Legal Aid Chicago states plausible claims under the FHA.**..........................11

    A.    Legal Aid Chicago challenges a specific policy....................................11

    B.    Legal Aid Chicago alleged statistical disparity......................................11

    C.    Legal Aid Chicago adequately alleged a causal connection. .................15

III.    **Count III states a claim for unfair business practice in violation of the ICFA.** ........16

    A.    Legal Aid Chicago has statutory standing under the ICFA. ..................16

    B.    Legal Aid Chicago Has Plausibly Alleged a Violation of ICFA. ..........18

CONCLUSION ........................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Living of Metro. Chicago v. City of Chicago,*
    372 F. Supp. 3d 663 (N.D. Ill. 2019) ....................................................................13

*Athey Prod. Corp. v. Harris Bank Roselle,*
    89 F.3d 430 (7th Cir. 1996) .................................................................................16

*Bank of Am. Corp. v. City of Miami, Fla*.,
    581 U.S. 189 (2017)...............................................................................................8

*Bank One Milwaukee v. Sanchez,*
    336 Ill. App. 3d 319 (2d Dist. 2003)....................................................................17

*Batson v. Live Nation Ent., Inc.*,
    746 F.3d 827 (7th Cir. 2014) ...............................................................................18

*Bazile v. Fin. Sys. of Green Bay, Inc*.,
    983 F.3d 274 (7th Cir. 2020) .................................................................................5

*Betsey v. Turtle Creek Assocs.*,
    736 F.2d 983 (4th Cir. 1984) ...............................................................................12

*Boim, v. Am. Muslims for Palestine*,
    9 F.4th 545 (7th Cir. 2021) ...................................................................................5

*Breeze v. Bayco Prod. Inc.*,
    475 F. Supp. 3d 899 (S.D. Ill. 2020)..............................................................16, 17

*CHS Acquisition Corp. v. Watson Coatings, Inc.*,
    2018 WL 3970137 (N.D. Ill. Aug. 20, 2018) ......................................................16

*Ciarpaglini v. Norwood*,
    817 F.3d 541 (7th Cir. 2016) ...............................................................................10

*Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
    478 F. Supp. 3d 259 (D. Conn. 2020)..................................................................14

*Cnty. of Cook v. HSBC N. Am. Holdings, Inc.*,
    136 F. Supp. 3d 952 (N.D. Ill. 2015) .............................................................11, 15

*Cnty, of Cook v. Wells Fargo*,
    314 F. Supp. 3d 975 (N.D. Ill. 2018) ....................................................................9

*Crawford v. Marion Cty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007) ....................................................................6

*Dothard v. Rawlinson*,
  433 U.S. 321 (1977)...............................................................................14

*Gallagher v. Magner*,
  619 F.3d 823 (8th Cir. 2010) .................................................................12

*Garrett v. RentGrow, Inc.*,
  2005 WL 1563162 (N.D. Ill. July 1, 2005)............................................19

*H.O.P.E., Inc. v. Eden Mgmt. LLC*,
  128 F. Supp. 3d 1066 (N.D. Ill. 2015) .....................................................7

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)..............................................................................6, 7

*Huskey v. State Farm Fire & Cas. Co.*,
  2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) ....................................11, 12

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977)...............................................................................14

*Keep Chicago Livable v. City of Chicago*,
  913 F.3d 618 (7th Cir. 2019) ...................................................................7

*Mack v. Resurgent Cap. Servs., L.P.*,
  70 F.4th 395 (7th Cir. 2023) ....................................................................5

*MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*,
  715 F. Supp. 2d 786 (N.D. Ill. 2010) .....................................................17

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
  558 F.2d 1283 (7th Cir. 1977) ...........................................................12, 15

*Mister v. Illinois Cent. Gulf R. Co.*,
  832 F.2d 1427 (7th Cir. 1987) ...............................................................14

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*,
  2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) .........................................13

*Natural Resources Defense Council v. Illinois Power Res., LLC*,
  202 F. Supp. 3d 859 (C.D. Ill. 2016) .......................................................8

*Reinhart v. Lincoln Cnty.*,
  482 F.3d 1225 (10th Cir. 2007) .............................................................13

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
   903 F.3d 415 (4th Cir. 2018) ................................................................14

*Roppo v. Travelers Cos.*,
   100 F. Supp. 3d 636 (N.D. Ill. 2015) ....................................................16

*Silha v. ACT, Inc.*,
   807 F.3d 169 (7th Cir. 2015) ..................................................................5

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) ................................................................................8

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................................10

*TBS Group LLC v. City of Zion*,
   2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) .........................................16

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) ........................................................................11, 15

*Trimuel v. Chicago Housing Auth.*,
   2023 WL 6290485 (N.D. Ill. Sept. 27, 2023) .......................................16

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021) ............................................................................11

*Vill. of Bellwood v. Dwivedi*,
   895 F.2d 1521 (7th Cir. 1990) ................................................................6

*Wigod v. Wells Fargo Bank*,
   673 F.3d 547 (7th Cir. 2012) ................................................................18

*Woods v. Cole*,
   181 Ill. 2d 512 (Ill. 1998) .......................................................................8

**Statutes**

42 U.S.C. § 3604 ...........................................................................................17

42 U.S.C. § 3604(a) .........................................................................................4

735 ILCS 5/9-121 ...........................................................................................17

735 ILCS 5/9-121(b) ...................................................................................4, 18

775 ILCS 5/1-101 .............................................................................................4

775 ILCS 5/1-101 *et seq* ...............................................................................17

## INTRODUCTION

Legal Aid Chicago brings this action against Defendant Hunter Properties, Inc. ("Hunter") for violation of the federal Fair Housing Act ("FHA") and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") based on Hunter's blanket policy of categorically denying housing to rental applicants with any prior history of eviction proceedings. This No-Evictions Policy disparately impacts Black renters and Black women renters and does not bear a reasonable relationship to whether a prospective tenant poses an elevated risk of not paying rent or otherwise being an unsatisfactory tenant. Hunter's policy thus violates federal and state law.

Hunter moves to dismiss arguing that Legal Aid Chicago lacks standing and otherwise has failed to state a claim. But the allegations are clear and adequate: Hunter's No-Evictions Policy squarely impedes Legal Aid Chicago's mission to assist low-income and otherwise vulnerable individuals facing eviction, and Legal Aid Chicago's efforts responding to that policy has diverted its resources from its other work, including other housing advocacy programs. The complaint sets forth that Hunter's policy has an unlawful disparate impact on Black renters and Black women and is irreconcilable with Illinois's public policy as expressed in several statutes. The motion to dismiss should be denied.

## STATEMENT OF FACTS

### A.    Hunter's No-Evictions Policy

Hunter manages more than 2,500 rental apartments across 60 locations in Chicago, Illinois. Dkt. 1 ("Compl.") at ¶¶ 1, 21. Hunter maintains a blanket No-Evictions Policy to categorically reject applicants who have *any* history of an eviction case against them, regardless of the outcome of the case, how long ago the case occurred, or the tenant's current ability to pay rent or otherwise fulfill the terms of a residential lease. *Id*. ¶¶ 2, 25. The No-Evictions Policy not only automatically excludes those with *any* prior eviction history when they apply for housing, but also deters

1

individuals with eviction histories from even submitting rental applications in the first place. *Id*. ¶¶ 2, 13-15, 26-30.

Hunter has implemented the No-Evictions Policy by stating explicitly on its website that "[p]rior eviction *filings* will result in denial" of a rental application. *Id*. ¶ 25 (emphasis added). Under this policy, Hunter categorically denies housing applicants who have *ever* found themselves connected with an eviction case. *Id.* ¶¶ 27, 31-33. Hunter requires prospective tenants who fill out its online rental application to answer "yes" or "no" to the question "Have you ever been evicted?" *Id.* ¶ 26. Hunter uses broad and ambiguous terms such as "eviction filing" or "evicted," without providing definitions or any limiting language to exclude sealed evictions, and Hunter denies prospective tenants any opportunity to provide explanatory information or other details about a prior eviction case. *Id.* ¶¶ 26, 28, 29, 31, 33. Hunter also requires all adult household members to undergo background checks conducted by tenant screening services that search for prior eviction records, which may include sealed records. *Id.* ¶¶ 26, 32. Under Hunter's policy, prospective tenants must disclose the name and contact information of a "current landlord," which Hunter may use to inquire about past eviction cases. *Id.* ¶ 26. Further, Hunter imposes a $70 per-adult application fee that is not refundable in the event a rental application is denied. *Id.* ¶¶ 26, 29.

## B.     Discriminatory Impact of Hunter's No-Evictions Policy

By deterring applications from and categorically denying housing to individuals with any eviction history, Hunter's No-Evictions Policy disproportionately excludes from housing opportunities Cook County's Black renters, and especially Black women renters. *Id.* ¶¶ 16, 40. Black people accounted for more than half of those either served with an eviction case or evicted by the Cook County Sheriff's Office from September 2010 to March 2023, even though they make

up just one third of Cook County renters. *Id.* ¶ 35. Black renters in Cook County were, on average, nearly three times as likely to experience an eviction case than non-Black renters. *Id.*

Black women renters in particular experience eviction more frequently than any other group. *Id.* ¶ 38. Despite making up approximately one-fifth of Cook County renters, Black women alone accounted for one-third of those served with an eviction case or evicted by the Cook County Sheriff's Office from September 2010 to March 2023. *Id*. On average, Black women renters faced a likelihood of experiencing an eviction case of 4.9%, compared to 3.1% for all other renters. *Id.*

### C. Injury to Legal Aid Chicago from Hunter's No-Evictions Policy

Legal Aid Chicago is a non-profit organization that provides free legal services to individuals and families in Cook County who have low income or face other obstacles in exercising their rights. *Id*. ¶ 20. Among the myriad services it provides, Legal Aid Chicago represents hundreds of clients in eviction cases each year, advocates for tenants' rights, and operates a Fair Housing Investigation and Enforcement Project. *Id.* ¶¶ 45, 47-48, 51, 53. Hunter's No-Evictions Policy injures Legal Aid Chicago by frustrating its mission of, and diverting its resources from, preventing and reducing the impact of eviction on the county's vulnerable residents. *Id.* ¶ 65.

Hunter's No-Evictions Policy also frustrates Legal Aid Chicago's efforts to further its mission to prevent evictions and displacement and ensure fair access to housing through robust eviction defense. Legal Aid Chicago's clients facing the possible threat of a soon-to-be filed eviction case—or an impending eviction trial—often decide they are better off moving out to avoid acquiring an eviction record, even if they have valid defenses. *Id*. ¶ 68. By chilling Legal Aid Chicago's clients from asserting and litigating meritorious claims and defenses, Hunter's policy undermines Legal Aid Chicago's mission of advancing tenants' rights and securing housing justice through the legal system.

3

Legal Aid Chicago has expended considerable staff time and resources to identify and assess the discriminatory impacts of Hunter's practices, including through fair housing testing, applicant interviews, and Freedom of Information Act requests. *Id*. ¶ 66. Legal Aid Chicago has taken steps to counteract those impacts, including, but not limited to, steps such as resolving threatened evictions prior to case filing; assisting tenants in seeking to seal eviction records, including, for example, the records of cases that did not result in an eviction or were otherwise dismissed and therefore ought not to derail an application for rental housing; more aggressively litigating cases and preparing for trial so clients can establish grounds for sealing records; and educating tenants, landlords, and others about the discriminatory impacts of categorically rejecting prospective tenants with any connection to a past eviction. *Id.* Even these counteracting efforts are often frustrated. For example, even after Legal Aid Chicago goes through the extensive effort of sealing eviction records, Hunter denies would-be tenants based on sealed eviction records and deters potential tenants through its advertised No-Evictions Policy. *Id*. ¶ 67. If not for the No-Evictions Policy, Legal Aid Chicago could have devoted more of its limited resources to affirmative housing advocacy and helping more tenants defend their rights to possession of their homes, instead of the counteractivities. *Id.* ¶ 66.

### D. Legal Aid Chicago's Complaint

Legal Aid Chicago alleges violations of the FHA and the ICFA. In Count I, Legal Aid Chicago alleges that Hunter's No-Evictions Policy is racially discriminatory in violation of the FHA, 42 U.S.C. § 3604(a). Compl. ¶¶ 72-75. In Count II, Legal Aid Chicago alleges the No-Evictions Policy violates the FHA's prohibition against discrimination based on race and sex because the policy has an unjustified disparate impact on Black women. *Id*. ¶¶ 76-79. And in Count III, Legal Aid Chicago alleges that Hunter's practice offends public policy, is immoral, unethical,

oppressive, unscrupulous, and injurious to consumers in violation of the ICFA. *Id.* ¶¶ 80-87. Among other things, Hunter's policy violates Illinois's policy against race and sex discrimination as embodied in the state's Homelessness Prevention Act, 310 ILCS 70/1, and Human Rights Act, 775 ILCS 5/1-101, and undermines the State's decision to allow courts to seal eviction records so that the public may not rely on those records, *see* 735 ILCS 5/9-121(b). Compl. ¶¶ 83-84

## LEGAL STANDARD

A challenge to subject matter jurisdiction under 12(b)(1) can be either "a facial or a factual attack on the plaintiff's allegations." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). A facial attack under 12(b)(1) tests whether the allegations in the complaint, taken as true and construed in favor of the plaintiff, support an inference that the elements of standing exist. *Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015). In resolving a factual attack, the court may consider evidence outside the pleadings to determine whether jurisdiction exists. *Id.* at 173. But where that attack overlaps with a challenge to a federal cause of action, the court must still "handle the objection as a direct attack on the merits of plaintiff's case, applying the protections inherent to merits challenges under Rule 12(b)(6) or Rule 56." *Boim, v. Am. Muslims for Palestine*, 9 F.4th 545, 557 (7th Cir. 2021) (internal quotation marks omitted). In considering a motion to dismiss pursuant to 12(b)(6), a court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 405 (7th Cir. 2023).

## ARGUMENT

### I.      Legal Aid Chicago has standing to bring this action.

Article III standing consists of three elements: "a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Mack*, 70 F.4th at 403 (internal quotation marks

omitted). To establish injury in fact, a plaintiff "must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id*. (internal quotation marks omitted).

An injury in fact for Article III purposes may be established by alleging an injury under the FHA. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). In particular, Legal Aid Chicago may assert standing in its own right, demonstrating injury under the FHA—and thus Article III—by alleging that a defendant's conduct frustrated the organization's mission and caused the group to divert resources from other activities to combat a defendant's conduct. *See id*. at 378-79. The economic cost of the injury need not be significant. *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007). Relying on *Havens*, the Seventh Circuit has explained that "the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). The court reasoned that "[t]hese are the opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination." *Id*.

Under *Havens* and *Bellwood*, Legal Aid Chicago has suffered an injury in fact that is cognizable and actual because its time and resources have been deflected away from its tenant-advocacy and counselling activities by the need to fight discrimination caused by the No-Evictions Policy. Hunter's policy impairs Legal Aid Chicago's mission to prevent and reduce the impact of evictions for Cook County's low-income residents. Compl. ¶¶ 45, 47-48, 51, 53, 65. And Legal Aid Chicago has had to divert resources away from its other activities and towards the investigation of Hunter's illegal practices and counteracting activities. *Id*. ¶ 66. This diversion of resources and frustration of mission harmed Legal Aid Chicago and caused an injury in fact. *Id.* ¶ 69.

A. **Legal Aid Chicago alleges that its injuries were fairly traceable to and proximately caused by Hunter's policies and practices.**

Legal Aid Chicago's injuries are fairly traceable to Hunter's conduct. As the Complaint alleges, Hunter caused the injuries by implementing a No-Evictions Policy among its more than 2,500 rental units serving the same geographic location and same low-income renter population that Legal Aid Chicago primarily serves. Compl. ¶¶ 1-2, 21. Hunter's own comparison to the affordable housing rental market in Chicago shows it controls 10% of the affordable housing units in 15% of the affordable buildings in Chicago. Mem. at 8. Because that policy affected the population that Legal Aid Chicago serves and frustrated Legal Aid Chicago's ability to achieve its mission, *see id.* ¶¶ 45, 47-48, 51, 53, 65-66, 69, the organization's injuries are fairly traceable to Hunter. Article III demands no more. *See Havens*, 455 U.S. at 379 (allegations that defendant's practices "perceptibly impaired [plaintiff organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers" met Article III standing requirement).

Legal Aid Chicago's specific allegations of sustaining harm from Hunter's policy distinguishes this case from the cases upon which Hunter relies. *See* Mem. at 6-7. In *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019), the organization lacked standing because it had alleged "only a high level of generality and without a clear nexus to any legally-protected right or interest of the organization" that the challenged ordinance harmed it. In *H.O.P.E., Inc. v. Eden Mgmt. LLC*, 128 F. Supp. 3d 1066, 1078 (N.D. Ill. 2015), the organization did not allege an injury traceable to the state defendants because it had investigated and tested only the private defendants. Here, Legal Aid Chicago's specific allegations of its direct injuries include that Hunter's policy has frustrated its mission and caused diversion of resources by requiring Legal Aid Chicago to take counteractions against Hunter in particular. Compl. ¶¶ 66, 69.

7

And contrary to Hunter's claim (at 6-7), that multiple parties may contribute to an injury does not mean the injury is not fairly traceable to each individual actor. *See, e.g., Natural Resources Defense Council v. Illinois Power Res., LLC,* 202 F. Supp. 3d 859, 873 (C.D. Ill. 2016) ("When multiple sources contribute to the pollution at issue, plaintiffs . . . "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.").

Next, Hunter conflates the requirements of Article III standing and the proximate cause element of an FHA claim when it argues (at 7) that it "is only one of many landlords in Cook County who screen prospective tenants for past evictions" and thus cannot be the proximate cause of Legal Aid Chicago's injuries. *See Bank of Am. Corp. v. City of Miami, Fla*., 581 U.S. 189, 197 (2017) (discussing difference between constitutional standing and statutory standing). While not a constitutional standing issue, proximate cause under the FHA requires foreseeability and "some direct relation between the injury asserted and the injurious conduct alleged." *Id*. at 202. That standard is met here because Hunter subjected Legal Aid Chicago's client base to the No-Evictions Policy, which frustrated the organization's mission by impacting the value of legal services it provided to its tenants facing evictions and compelled it to respond to Hunter's actions. Legal Aid Chicago need not establish that Hunter's No-Evictions Policy is the *sole* proximate cause of its injuries, or even the *predominant* proximate cause—only that Hunter's policy is *a* proximate cause of those injuries. *See Staub v. Proctor Hosp.,* 562 U.S. 411, 420 (2011).; *accord, Natural Resources Defense Council v. Illinois Power Res., LLC,* 202 F. Supp. 3d 859, 873 (C.D. Ill. 2016) (each individual polluter can proximately cause collective pollution). That other landlords may have simultaneously contributed to some of Legal Aid Chicago's cognizable injuries does not diminish Hunter's responsibility. *See Woods v. Cole*, 181 Ill. 2d 512, 518-19 (Ill. 1998).

8

Hunter also argues that it did not proximately cause the alleged injury because "Legal Aid does not identify any actions taken in direct response to Hunter Properties' challenged conduct." Mem. at 6. Not so. At the cost of staff time and resources, Legal Aid Chicago directly investigated Hunter's policies and issued public records requests to determine the extent of its discriminatory harm. Compl. ¶ 66. But more fundamentally, by categorically rejecting any tenant involved in a past eviction case, regardless of the outcome, Hunter forced Legal Aid Chicago to change the way it advised its approximately 450 eviction defense clients annually and to divert resources to more aggressively litigate and prepare cases for trial in order to qualify their clients for record sealing, and pursuing orders to seal case records even when the tenant prevailed. *See id.* ¶ 45, 67-68.

In *County of Cook v. Wells Fargo*, the court found that discriminatory lending practices that resulted in large numbers of foreclosures proximately caused an injury to the County "within the first step of the causal chain" even "despite running through an 'intervening link of injury' to borrowers.'" 314 F. Supp. 3d 975, 984 (N.D. Ill. 2018). Legal Aid Chicago's asserted injuries likewise flow within the "first step of directness" from no-evictions policies such as Hunter's, which are the immediate and substantially sole reason why the organization has had to prioritize eviction record sealing and advise clients to consider the impact of eviction case filings on their future housing prospects before litigating valid defenses. Compl. ¶¶ 66-67.

  **B.**  **Hunter's purported factual challenges to jurisdiction should be rejected.**

Through an unsupported declaration, the accuracy of which Legal Aid Chicago has not had the opportunity to test through discovery, Hunter claims that it did not proximately cause Legal Aid Chicago's injuries because it no longer employs a categorical No-Evictions Policy. *See* Mem. at 8; Dkt. No. 27, Decl. of Hilary Frey ("Frey Decl.") at ¶¶ 4-6. This assertion does not contest the Court's subject matter jurisdiction over the injuries Legal Aid Chicago has suffered and which this

9

Court may redress.[1] Indeed, the declaration does not cast any doubt on the Complaint's key allegation that Hunter implemented the No-Evictions Policy by stating explicitly on its website that "[p]rior eviction filings will result in denial" of a rental application. *Id*. ¶ 25. To the contrary, Frey concedes that Hunter's public-facing statements did not "accurately reflect [a] prospective tenant screening process" of "consider[ing] and review[ing] each application," "afford[ing] prospective tenants the opportunity to explain negative information," and not "reject[ing] potential tenants with satisfactory credit histories." Frey Decl. ¶ 5. Moreover, Hunter's statement that it currently employs a policy of screening potential tenants for evictions occurring only in the 12-month period prior to their applications, *id*. ¶ 6, does not cure the harms complained of nor address the allegations that Legal Aid Chicago suffered harms from Hunter's past conduct. *See* Compl. Prayer for Relief, D (requesting damages). And even if Hunter has changed its practices, its voluntary cessation of its prior illegal conduct does not deprive the Court of subject matter jurisdiction. *See Ciarpaglini v. Norwood*, 817 F.3d 541, 544-45 (7th Cir. 2016).

### C. Legal Aid Chicago's injuries are redressable by the Court.

Without any legal authority, Hunter claims that Legal Aid Chicago's injuries are not redressable because Hunter controls a "fraction" of the rental market and a judgment against Hunter will not stop the organization from needing to continue counteracting activities in order to address other landlords' blanket bans on eviction history. Mem. at 7-8; Frey Decl. ¶ 3. But because Legal Aid Chicago has alleged injuries that are directly caused by Hunter's No-Evictions Policy, those injuries are redressable by a judgment against Hunter. In any case, "[t]he ability to effectuate

---

[1] Insofar as Hunter is making a statutory/prudential standing argument, such claim is not properly considered on a 12(b)(1) motion, because it does not go to the court's power to hear the case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) ("[A]n issue of statutory standing has nothing to do with whether there is case or controversy under Article III.").

a partial remedy satisfies the redressability requirement." *Uzuegbunam v. Preczewski,* 141 S. Ct. 792, 801 (2021) (internal quotation marks omitted).

## II.     Legal Aid Chicago states plausible claims under the FHA.

Disparate impact liability under the FHA "target[s] artificial barriers to housing" that "function unfairly to exclude minorities . . . without sufficient justification." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015). To establish a *prima facie* case of disparate impact, a plaintiff must "allege facts . . . or produce statistical evidence demonstrating a causal connection." *Id.* This boils down to three elements: (1) a specific policy; (2) a statistical disparity; and (3) a causal connection. *Huskey v. State Farm Fire & Cas. Co.*, 2023 WL 5848164, at *7 (N.D. Ill. Sept. 11, 2023) (citing *Inclusive Cmtys.*, 576 U.S. at 542–43).

### A.     Legal Aid Chicago challenges a specific policy.

Hunter contends that Legal Aid Chicago has not identified a specific policy subject to challenge under the FHA because other landlords also use a no-evictions policy. Mem. at 10. But Hunter cites no authority as to why it matters that other landlords also have the same policy. To the contrary, the detailed allegations identifying *Hunter*'s No-Evictions Policy plead a disparate impact claim, particularly given their reference to Hunter's own statements on its website and rental application. Compl. ¶¶ 25, 26; *see, e.g.*, *Cnty. of Cook v. HSBC N. Am. Holdings, Inc.*, 136 F. Supp. 3d 952, 966–67 (N.D. Ill. 2015) (plaintiff identified a specific policy by alleging that the defendants maintained discretionary pricing policies that "increased the costs for loans made to minority borrowers"). This is sufficient. *See Inclusive Comtys.*, 576 U.S. at 542.

### B.     Legal Aid Chicago alleged statistical disparity.

Legal Aid Chicago has plausibly alleged two types of statistical disparities that show that Hunter's No-Evictions Policy has a significant disparate impact based on race, as well as on race and sex. First, Black renters and Black women renters in Cook County are significantly more likely

11

than non-Black renters or non-Black women renters in Cook County to have had an eviction-related proceeding. *See* Compl. ¶ 35. These allegations are in accord with a well-established method of determining whether a policy has a disparate impact by providing a statistical analysis that compares the relative percentage of a particular group that is adversely impacted by the policy versus the percentage impacted among those not in that group and shows that members of the specific group are more likely to be adversely impacted. *See e.g.*, *Huskey*, 2023 WL 5848164, at *8 (plaintiffs stated a claim when they plausibly alleged "statistically significant disparities between the experiences of Black versus white State Farm policyholders"); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987-88 (4th Cir. 1984) (disparate impact was established by statistics showing defendant's policy resulted in eviction notices being sent to 54.3% of nonwhite tenants but only 14.1% of white tenants).

Second, more than half of the individuals served with an eviction case or evicted are Black renters, even though they make up just one-third of Cook County renters. Compl. ¶ 5. Black women renters make up approximately one-fifth of all renters but alone account for approximately one-third of all renters served with an eviction case or evicted. *Id.* ¶ 35. Comparing the proportion of a particular group among those adversely impacted by a policy to that group's proportion in the general population, where that particular group is overrepresented among those adversely impacted relative to its share of the population, is another well-established method of showing disparate impact. *See, e.g.*, *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010) (City's policy that allegedly decreased the supply of affordable housing opportunities was shown to have a disproportionate adverse impact on Black residents based on data showing approximately 61% of the population seeking such housing was Blacks while Black residents made up only 11.7% of the City's population); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1286

12

(7th Cir. 1977) (noting the racially disparate impact of the defendant's action where Black people constituted 40% of the group of low-income persons impacted versus 18% of the area's total population).

Hunter concedes that Legal Aid Chicago alleges "there is a statistical disparity in the pool of tenants who would be impacted by an alleged 'No-Evictions Policy' if they attempted to complete Hunter Properties' online rental application." Mem. at 11. Hunter, however, argues that the statistical analysis must be based on information about its existing tenants rather than the pool of potential tenants of its apartments in the relevant housing market. *Id*. That is erroneous for two reasons. First, Legal Aid Chicago does not have access to the data from which to statistically analyze the demographic composition of Hunter's existing tenant or applicant pools. Whatever the information in Hunter's control might eventually show does not make the statistics that Legal Aid Chicago alleged any less plausible. *See Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *13 (N.D. Ill. Nov. 13, 2019) (the question is whether "Defendants' methodological challenges . . . renders the statistical allegations unreliable or implausible."); *Access Living of Metro. Chicago v. City of Chicago*, 372 F. Supp. 3d 663, 671-72 (N.D. Ill. 2019) (challenges to plaintiffs' methodology for showing disability discrimination are not appropriate under federal pleading standards). Second, the No-Evictions Policy has deterrent effects on persons outside Hunter's actual tenant population and applicant pool, and thus the relevant housing market logically includes potential applicants as well as actual applicants or tenants.

"[W]hen evaluating disproportionate impact, [the] court looks to the subset of the population affected by the challenged policy." *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1230 (10th Cir. 2007). Here, Hunter's No-Evictions Policy affects both *applicants*, by excluding them, and *potential applicants*, by discouraging them from ever applying. Therefore, the relevant

13

analysis focuses on the impact that the policy has on the pool of potential applicants as a whole. *See Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (approving use of national statistics in Title VII disparate impact case where "otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977) ("If an employer should announce his policy of discrimination . . . his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."); *Mister v. Illinois Cent. Gulf R. Co.*, 832 F.2d 1427, 1436 (7th Cir. 1987) ("An applicant pool analysis is biased against finding discrimination, if potential applicants know or suspect that the employer is discriminating.").

Recent cases challenging similar tenant screening policies under the FHA are in accord. *See, e.g.*, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 428 (4th Cir. 2018) (considering statistical analysis about the "population in Virginia" when determining the plaintiffs "sufficiently alleged a prima facie case of disparate impact" of a housing provider's policy); *Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 292 (D. Conn. 2020) ("[T]he potential applicant pool data may provide a more accurate depiction of the true discriminatory impact than the actual applicant pool data[.]").

Legal Aid Chicago alleges that Hunter's apartments attract potential tenants from all across Cook County. Compl. ¶ 39. The renter population of Cook County is therefore the most logical proxy for the potential applicant pool for Hunter's apartments that is impacted by the No-Evictions Policy, either by the deterrent effect of Hunter's publicly available statements of its policy on its website or by Hunter's denial of rental applications from anyone with a connection to a prior eviction case. *See Vill. of Arlington Heights*, 558 F.2d at 1288.

14

### C.     Legal Aid Chicago adequately alleged a causal connection.

Legal Aid Chicago need only allege facts sufficient to support a causal connection between the challenged policy and the disparate impact. *See HSBC N. Am. Holdings, Inc.*, 136 F. Supp. 3d at 966. This requirement is necessary to "protect[] defendants from being held liable for racial [and gender] disparities they did not create." *Inclusive Comtys.*, 576 U.S. at 542. That risk is not at issue here because Legal Aid Chicago seeks to hold Hunter responsible for only those disparities that it *did* cause—the disproportionate exclusion of Black renters and Black women renters from housing opportunities with Hunter.

Legal Aid Chicago plausibly alleges the existence of a causal connection between Hunter's No-Evictions Policy and the statistical racial and gender disparities in Hunter's applicant pool. *See HSBC N. Am. Holdings, Inc.*, 316 F. Supp. 3d at 952. Hunter deterred prospective tenants with eviction histories from applying for housing by automatically denying all such applicants and clearly stating the No-Evictions Policy on its website and public-facing materials. Compl. ¶¶ 1–2, 25–33, 74, 78. That policy disproportionately excludes Black renters and Black women renters because they are significantly more likely to have experienced an eviction case in Cook County. *Id.* ¶¶ 5, 7, 16, 34–40, 74, 78. Indeed, recent guidance from the Department of Housing and Urban Development and the Consumer Financial Protection Bureau confirm that consideration of eviction history may unjustly exclude people based on race and other protected characteristics. *Id.* ¶¶ 12, 44.

Hunter's cases are inapposite because the plaintiffs in those cases failed to plead facts drawing *any* causal connection between the statistical disparities and the challenged policies. *See Trimuel v. Chicago Housing Authority*, 2023 WL 6290485, at *7 (N.D. Ill. Sept. 27, 2023); *TBS Group LLC v. City of Zion*, 2017 WL 5129008, at *8–9 (N.D. Ill. Nov. 6, 2017). Here, Legal Aid

Chicago provides extensive allegations drawing the link between the statistical disparities in eviction rates faced by Black renters and Black women renters and the resulting disproportionate exclusion of Black renters and Black women renters from housing opportunities by Hunter's categorical No-Evictions Policy. *See* Compl. ¶¶ 1–5, 7, 16, 25–40, 74, 78.

### III.    Count III states a claim for unfair business practice in violation of the ICFA.

#### A.    Legal Aid Chicago has statutory standing under the ICFA.

Legal Aid Chicago has statutory standing under the ICFA. A non-consumer plaintiff has standing to pursue ICFA claims if they "allege conduct [that] involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Roppo v. Travelers Cos.*, 100 F. Supp. 3d 636, 651 (N.D. Ill. 2015) (internal quotation marks omitted). The adequacy of such allegations is measured by the consumer nexus test. *Athey Prod. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436-37 (7th Cir. 1996). That test has four prongs: "(1) that [Plaintiff's] actions were akin to a consumer's actions to establish a link between them and consumers; (2) how defendant's representations ... concerned consumers other than [Plaintiff]; (3) how defendant's particular [activity] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers." *Breeze v. Bayco Prod. Inc.*, 475 F. Supp. 3d 899, 906 (S.D. Ill. 2020). Legal Aid Chicago satisfies this test.

First, Hunter argues simply that Legal Aid Chicago is "not a consumer of residential rental services." Mem. at 12. Of course, it need not be a consumer, otherwise there would be no need for the consumer nexus test. Hunter does not otherwise argue that Legal Aid Chicago lacks an adequate link to the consumers of the rental market. Unlike the situation in *CHS Acquisition Corp. v. Watson Coatings, Inc.*, 2018 WL 3970137, at *13 (N.D. Ill. Aug. 20, 2018), upon which Hunter relies for its general argument, where the plaintiff did not state any non-attenuated link to the consumers targeted by the defendant, here Legal Aid Chicago has alleged close involvement with

renters and applicants. Indeed, the efforts of Legal Aid Chicago to advance its mission, including by arranging for testing of Hunter's policy and enabling its clients to effectively exercise their own rights as tenants or housing applicants, is closely tied and akin to a renter's experience in the housing market. The ICFA "is to be liberally construed" to eradicate unfair practices, *Bank One Milwaukee v. Sanchez*, 336 Ill. App. 3d 319, 323 (2d Dist. 2003), and Legal Aid Chicago has alleged a relationship with the consumers—its clients—affected by Hunter's No-Evictions Policy that shows the organization is in a prime position to vindicate the ICFA's purpose.

Second, Hunter's website sets out its blanket No-Evictions policy that applies to all would-be tenants. This policy is unquestionably directed to and affects the market of residential tenants generally. *See Breeze*, 475 F. Supp. 3d at 907 (holding a public statement on a website was directed to the consumer public in general). Hunter argues that its conduct is "not significant enough to raise consumer protection concerns." Mem. at 13. But Hunter's authority, *MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 793 (N.D. Ill. 2010), simply holds that an action must have a wide enough scope to affect the market generally, as opposed to a single party. Further, Hunter is a substantial business with 60 properties and 2,500 rental units and thus is orders of magnitude more significant than individuals subletting one or a few units.

Third, Hunter's No-Evictions Policy implicates consumer protection concerns and runs contrary to public policy because it undermines state and federal statutes designed to protect consumers of residential housing, including 735 ILCS 5/9-121, which authorizes sealing eviction records; 310 ILCS 70/1, the Homelessness Prevention Act; 42 U.S.C. § 3604, the FHA; and 775 ILCS 5/1-101 *et seq*, the Illinois Human Rights Act. *See* Compl. ¶¶ 82-84. Legal Aid Chicago further alleges that Hunter's policy disproportionately affects Black renters, particularly Black women, who are more likely to have been sued in an evictions case. *Id*. ¶ 84. Hunter's policy also

has deleterious impacts on the civil legal system because it prevents the eviction courts from affording complete relief to improperly sued tenants and it chills tenants from exercising rights under their leases and landlord-tenant statutes. This impact of Hunter's policy is irreconcilable with Illinois policy as expressed through its numerous statutes.

Fourth, Legal Aid Chicago seeks a permanent injunction barring Hunter from continuing its No-Evictions Policy. Compl. Prayer for Relief at ¶ C. It is in consumers' and the public's interests that the Court bar Hunter from using its No-Evictions Policy.

### B. Legal Aid Chicago Has Plausibly Alleged a Violation of ICFA.

To state a claim under the ICFA for an unfair business practice, Legal Aid Chicago must allege (1) a deceptive or unfair practice by Hunter; (2) Hunter intended reliance on its practice; (3) the unfair practice occurred in the course of conduct involving trade or commerce; and (4) the unfair practice proximately caused injury. *Wigod v. Wells Fargo Bank*, 673 F.3d 547, 574 (7th Cir. 2012). These elements are satisfied here.

First, Legal Aid Chicago has alleged that Hunter's No-Evictions Policy is an unfair practice. Conduct that is not deceptive is unfair if it "(1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). A plaintiff need meet only one of these criteria. *Id*. Hunter's No-Evictions Policy offends public policy because it undermines state and federal statutes designed to protect consumers of residential housing. *See* Compl. ¶¶ 82-84. Those statutes set forth standards of conduct prohibiting housing discrimination and authorizing the sealing of eviction records. But, as discussed, the unjustified disparate impact of Hunter's policy violates fair housing laws. And Hunter's reliance on sealed eviction records to deny individuals housing cannot be squared with the standard of conduct requiring that parties are expected to

18

respect the sealing of records because the sealing of the records is intended to prevent landlords such as Hunter from using those records in housing decisions. *See* 735 ILCS 5/9-121(b).

Hunter claims that its practice of disqualifying applicants with "eviction histories has been recognized as insufficient to constitute an unfair practice under the ICFA." Mem. at 14 (citing *Garrett v. RentGrow, Inc.*, 2005 WL 1563162, at *3-4 (N.D. Ill. July 1, 2005)). But *Garrett* is distinguishable. There, the landlord rejected a rental applicant because of an eviction record that a tenant-screening service had reported. The tenant did not challenge a categorical ban like the No-Evictions Policy, but rather argued that the specific record relied upon by the landlord was not hers. *Id*. at *1-2. In determining that the plaintiff failed to state a claim, the court acknowledged that an unfair practice "offends public policy if it violates a standard of conduct set out by an existing statute," but held that Garrett "fail[ed] to point to any established statute" that covered the challenged conduct. *Id*. at *3. Here, however, Legal Aid Chicago has pointed out several statutes that are undermined by Hunter's No-Evictions Policy, none of which were considered in *Garrett*.

Second, Hunter stated its No-Evictions Policy directly on its website and featured it prominently in its housing application, thereby deterring applicants. Compl. ¶¶ 25-26. The reasonable inference to be drawn is that Hunter intended would-be applicants to rely on that policy.

Third, it is undisputed that the alleged unfair practice occurred in the course of commercial conduct.

Last, the unfair practice proximately caused Legal Aid Chicago's injury. As discussed *supra*, Hunter's policy forced Legal Aid Chicago to divert resources and frustrated its mission. Compl. ¶¶ 66-68. The cost to Legal Aid Chicago of expending these resources is an actual pecuniary loss. As Hunter itself admits, the failure to quantify the pecuniary loss in the complaint is not a pleading flaw. Mem. at 15.

19

**CONCLUSION**

For the foregoing reasons, Hunter's motion to dismiss should be denied.

Respectfully submitted,

By: */s/ Brian J. Massengill*
Brian J. Massengill
Megan E. Stride
Julia M. Petsche (admission forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-783-0600
bmassengill@mayerbrown.com
mstride@mayerbrown.com
jpetsche@mayerbrown.com

Eric Dunn (admission forthcoming)
Katherine E. Walz
National Housing Law Project
1663 Mission St., Suite 460
San Francisco, CA 94103
Tel: 415-546-7000
edunn@nhlp.org
kwalz@nhlp.org

Ameri R. Klafeta
Emily Werth
Roger Baldwin Foundation of ACLU, Inc.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Tel: 312-201-9740
aklafeta@aclu-il.org
ewerth@aclu-il.org

Linda S. Morris (admission forthcoming)
Jennesa Calvo-Friedman (admission forthcoming)
American Civil Liberties Union
Women's Rights Project
125 Broad St. 18th Fl.
New York, NY 10004
Tel: 212-549-2500
LindaM1@aclu.org
jcalvo-friedman@aclu.org

*Counsel for Plaintiff Legal Aid Chicago*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on November 21, 2023.

/s/ Brian J. Massengill
Brian J. Massengill