**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEGAL AID CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-4809 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| HUNTER PROPERTIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Legal Aid Chicago works with low-income residents of the City on legal issues, including tenant disputes and evictions. It brings this lawsuit to challenge a "No-Evictions Policy" that Hunter Properties, a landlord in Chicago, allegedly uses in its application process for apartments.

Legal Aid Chicago thinks that the policy has a disparate impact on black people, and black women in particular, who are more likely to be at risk of eviction in Cook County. And Legal Aid Chicago contends that this policy injures the organization itself. The organization alleges that it must spend resources to combat the impact of the policy on the community.

Legal Aid Chicago brings two federal discrimination claims and a state-law claim. Hunter Properties, in turn, moved to dismiss. It challenges Legal Aid Chicago's standing to bring the case, and moves to dismiss for failure to state a claim.

Legal Aid Chicago lacks standing, so this Court lacks jurisdiction. For the reasons stated below, the motion to dismiss is hereby granted.

### Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court

"offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

As the name suggests, Legal Aid Chicago is a legal aid organization that provides free legal services to low-income individuals in Cook County. *See* Cplt., at ¶ 20 (Dckt. No. 1). The services include legal assistance for housing-related issues. *Id.* at ¶ 18. For example, Legal Aid Chicago defends tenants in eviction cases and assists clients in sealing their eviction records. *Id.* at ¶¶ 18, 62. Legal Aid Chicago also seeks to reform the eviction process through education and other advocacy efforts. *Id.* at ¶¶ 18, 45. All in all, Legal Aid Chicago "dedicates significant resources to ensuring access to housing for its clients." *Id.* at ¶ 18.

Hunter Properties, Inc. is a property management company – in plain English, a landlord – based in Chicago. *Id.* at ¶ 21. Hunter Properties manages more than 2,500 apartments at 60 locations throughout the City. *Id.* Hunter Properties primarily offers lower-priced housing options. *See* Frey Decl. at ¶ 3 (Dckt. No. 27).

Legal Aid Chicago contends that Hunter Properties employs a blanket "No-Evictions Policy" when evaluating potential tenants. *See* Cplt., at ¶¶ 1, 10 (Dckt. No. 1). Legal Aid Chicago says that Hunter Properties will not rent to anyone with an eviction on their record. *Id.* at ¶ 2.

Prospective applicants can apply to rent an apartment on the website of Hunter Properties. The website asks all applicants a direct question: "Have you ever been evicted?" *Id.* at ¶ 26. There are two options: "yes" or "no." *Id.*

The online application requires a binary response. The website offers no space for an explanation. An applicant cannot explain the circumstances surrounding the eviction, and cannot

present any mitigating information. *Id.* at ¶ 14. The website does not explain what counts as an eviction, either. *Id.* at ¶¶ 14, 28.

Despite this lack of clarity, the costs for getting the question wrong are high. The website notes that "[f]alse or misleading statements will result in denial." *Id.* at ¶ 25.

The costs of getting it right are high, too – at least for any applicant who truthfully answers that he or she has been evicted. Legal Aid Chicago alleges "on information and belief" that Hunter Properties denies all applicants who answered "yes" to the eviction question. *Id.* at ¶¶ 14, 27. That's a reasonable assertion, since the website of Hunter Properties states in its "Terms and Conditions" that "[p]rior evictions filings will result in denial." *Id.* at ¶ 25.

Hunter Properties does not merely take an applicant's word for it, either. Hunter Properties uses tenant-screening services to check for past eviction records. *Id.* at ¶ 15. Hunter Properties then denies all applicants who have an eviction record identified by that third-party screening provider. *Id.* And the screening providers do not always get it right. They sometimes include sealed, outdated, or incorrect eviction records in their screening reports. *Id.*

Legal Aid Chicago argues that these policies, as well as the nonrefundable $70 application fee, deter potential tenants with prior eviction filings from applying. *Id.* at ¶¶ 28–29. The lack of a clear definition of what Hunter Properties views as an eviction maximizes that deterrent effect of its policy. *Id.* at ¶ 28.

Legal Aid Chicago also contends that past eviction records could show up on a potential tenant's screening, even if they don't impact a tenant's current ability to pay rent. *Id.* at ¶ 10.

For example, consider eviction *filings*. Eviction cases are filed unilaterally by a landlord. *Id.* at ¶ 1. Eviction cases, like other types of lawsuits, might not proceed to judgment. A landlord might withdraw the case, or the court might dismiss the case. *Id.* In other words, an

3

eviction filing is like filing a complaint in a civil case. It says next to nothing about the merits of the case.

But an eviction filing, even one filed in bad faith, can still show up when screening a potential tenant's record. *Id.* at ¶ 10. Third-party screening services also may include records of previous eviction proceedings that have been sealed by court order in their reports. *Id.* at ¶ 32.

Basically, Legal Aid Chicago thinks that screening for eviction filings does not always accurately reflect an individual's actual eviction record.

And Legal Aid Chicago is not the only organization that thinks so. Government agencies do, too. The Consumer Financial Protection Bureau and the Federal Trade Commission have acknowledged problems with eviction-screening reports. *Id.* at ¶¶ 9–12.

The CFPB issued a report finding that 22% of eviction court records contained misleading or erroneous information. *Id.* at ¶ 9 (citing Consumer Financial Protection Bureau, *Tenant Background Checks Market Report* (Nov. 15, 2022), https://files.consumerfinance.gov/f/documents/cfpb_tenant-background-checks_market_report_2022-11.pdf).

The FTC has filed complaints against screening companies for creating eviction reports without reconciling inaccurate or misleading information. *Id.* at ¶ 11.

What's more, an applicant rejected by Hunter Properties due to an associated eviction record – erroneous or not – may never find out why they were rejected. Many landlords do not notify prospective tenants of adverse actions based on screening reports, even where they are obligated to do so. *Id.* at ¶ 9.

Even when they contain accurate information, past eviction records don't necessarily tell a landlord the full story about a potential tenant's ability to perform as a tenant. People change.

4

They get new jobs, their financial obligations can shift, or they receive (or previously received) a rent voucher. *Id.* at ¶ 1. Sometimes, they win their eviction cases. *Id.* at ¶ 2. But under a blanket "No-Evictions Policy," even potential tenants who have prevailed in a previous eviction proceeding would be screened out from renting with Hunter Properties. *Id.* So the policy is not just a "no-successful-evictions" policy – it is a "no-eviction-*filings*" policy.

Evictions have an outsized effect on specific groups of people. Legal Aid Chicago explains how evictions impact black women. *Id.* at ¶ 4. One in five black women will experience eviction in their life, compared to one in fifteen white women. *Id.* (citing Jaboa Lake and Leni Tupper, *Eviction Record Expungement Can Remove Barriers to Stable Housing*, CENTER FOR AMERICAN PROGRESS (Sept. 30, 2021)).

And black children are twice as likely to experience eviction as white children. *Id.* (citing Emily A. Benfer, *U.S. Eviction Policy is Harming Children: The Case for Sustainable Eviction Prevention to Promote Health Equity*, HARV. LAW PETRIE-FLOM CENTER (Nov. 2, 2022), https://blog.petrieflom.law.harvard.edu/2022/11/02/pandemic-eviction-policy-children/).

The statistics in Cook County align with the national trends. *See* Cplt., at ¶ 5 (Dckt. No. 1). About one-third of the individuals served with an eviction case or evicted in Cook County between 2010 and 2023 were black women. *Id.* And while black people make up 33% of Cook County renters, they made up 56% of the people served with an eviction case or evicted between 2010 and 2023. *Id.* at ¶ 35.

Black people, especially black women, are more likely to be sued in an eviction action than their white counterparts. *Id.* at ¶ 7. Black women renters face a 4.9% likelihood of experiencing an eviction case, compared to 3.1% for all other renters in Cook County. *Id.* at

¶ 38. And because Hunter Properties attracts tenants from across Cook County, it is likely that these broader statistics hold true for Hunter Properties as well. *Id.* at ¶¶ 39–40.

Back to Legal Aid Chicago. The organization represents hundreds of clients in eviction matters every year, which is the most of any legal-aid program in Cook County. *Id.* at ¶ 45. Legal Aid Chicago employs 28 people in its housing practice group. *Id.* at ¶ 46. Those 28 people represent about 450 tenants each year. *Id.* To put it in perspective, about 30,000 eviction cases are filed in Cook County every year. *Id.* So the demand for services far exceeds Legal Aid Chicago's capacity. *Id.* It has too many people to help, and too few resources. *Id.* at ¶ 49.

Legal Aid Chicago also works to help its clients get their eviction records sealed. *Id.* at ¶ 63. Illinois law allows for the sealing of eviction records in certain circumstances, like if a case lacked a basis in fact or law. *Id.*; *see also* 735 ILL. COMP. STAT. 5/9-121(b). Sealing eviction records is not automatic – sealing the records must be in the interests of justice, and those interests must not be outweighed by the public's interest in the case. *See* Cplt., at ¶ 63 (Dckt. No. 1). So Legal Aid Chicago also spends time and resources arguing for the sealing of its clients' records. *Id.*

Legal Aid Chicago alleges that the "No-Evictions Policy" of Hunter Properties undermines its work of sealing eviction records and undercuts the purpose of the Illinois sealing statute itself. *Id.* at ¶ 65. Legal Aid Chicago has worked on more than 800 sealing cases over the last five years, devoting "thousands of hours" to dealing with eviction cases. *Id.* at ¶ 67. Again, too many cases, and too few resources.

As Legal Aid Chicago tells it, the "No-Evictions Policy" of Hunter Properties puts them even further behind the eight ball. The policy forces the group to more aggressively litigate

cases and seal all types of eviction records, not just the most pressing or promising ones. *Id.* at ¶ 66.

Legal Aid Chicago characterizes its mission as "maximizing low-income Cook County residents' access to safe, decent and affordable housing." *Id.* And Legal Aid Chicago thinks Hunter Properties stands in the way of that goal.

So Legal Aid Chicago sued Hunter Properties over its "No-Evictions Policy." Legal Aid Chicago brings three counts. *See* Cplt., at ¶¶ 72–87 (Dckt. No. 1).

Count I alleges race discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604. *Id.* at ¶¶ 72–75. The idea is that the policy of denying applicants with any prior eviction filings has a disparate impact on black renters in Cook County. *Id.* at ¶ 74.

Count II alleges race and sex discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604. *Id.* at ¶¶ 76–79. This count challenges the policy due to the alleged disparate impact on black women renters specifically. *Id.* at ¶ 78.

Count III alleges unfair residential leasing in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/2. *Id.* at ¶¶ 80–87.

Legal Aid Chicago requests declaratory and injunctive relief in addition to damages. *Id.* at 24.

Hunter Properties moved to dismiss for lack of standing, and for failure to state a claim. *See* Def.'s Mem. in Support of Mtn. to Dismiss (Dckt. No. 26).

**Legal Standard**

A motion to dismiss under Rule 12(b)(1) challenges whether this Court has subject matter jurisdiction over a claim or case. *See* FED. R. CIV. P. 12(b)(1); *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). "A standing challenge under Rule

12(b)(1) typically can take the form of a facial or a factual attack on the plaintiff's allegations." *Id.* (cleaned up). "A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist, and a factual attack tests the existence of jurisdictional facts underlying the allegations." *Id.* (cleaned up).

To evaluate a facial attack, this Court looks to the complaint to see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* The Court accepts "all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Id.*

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

### Analysis

The Court begins with the issue of standing. Subject matter jurisdiction is always the right place to start, because there is nowhere to go without it. First things first. *See Mack v. Resurgent Capital Servs., L.P.*, 70 F.4th 395, 402 (7th Cir. 2023).

Article III standing has three familiar elements: (1) injury in fact; (2) causation; and (3) redressability. *See Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). An injury is concrete if it is "'real,' and not 'abstract.'" *Id.* at 340.

An organization like Legal Aid Chicago can have standing to sue either through "associational standing" or "organizational standing." *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). It is the difference between suing for others, and suing for yourself.

Associational standing exists when an organization sues "on behalf of" its members. *Id.* at 800. Organizational standing allows a group to sue based on an injury to the organization "in its own right." *See Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008).

Legal Aid Chicago only asserts organizational standing, not associational standing. That is, Legal Aid Chicago brings its claims on its own behalf, not on behalf of its members or renters affected by the alleged policies of Hunter Properties. *See* Cplt., at 24 (Dckt. No. 1). In other words, Legal Aid Chicago wants a remedy for its *own* alleged injury. *Id.*

That's organizational standing. *See* Def.'s Mem., at 2 (Dckt. No. 26). Despite the lengthy name, the test for organizational standing is straightforward. It simply requires an organization to "meet[] the same standing test that applies to individuals." *OCA-Houston*, 867 F.3d at 610 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)). In other

words, Legal Aid Chicago itself must satisfy the three-part *Lujan* test of injury, causation, and redressability. *See Lujan*, 504 U.S. at 560–61.

Hunter Properties makes a facial challenge to Legal Aid Chicago's standing. In its view, Legal Aid Chicago failed to establish a direct causal link between its conduct and Legal Aid Chicago's alleged injury. *See* Def.'s Mem., at 2 (Dckt. No. 26). Hunter Properties skips to the issue of causation, hopping over the question of an injury in fact.

Before jumping to causation, the existence of an injury is worth a close, second look. To show that it has standing, Legal Aid Chicago must establish an injury in fact. The existence of an injury is the first step of standing. An injury in fact is "[f]irst and foremost" of standing's three requirements. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Spokeo*, 578 U.S. at 338.

Hunter Properties did not make an argument about the existence of an injury, but that's neither here nor there. After all, a federal court has an independent duty to check its jurisdictional moorings, including the existence of standing. *See, e.g.*, *Iten v. County of Los Angeles*, 81 F.4th 979, 984 (9th Cir. 2023) ("[F]ederal courts have a duty to raise, sua sponte, questions of standing before addressing the merits.").

Legal Aid Chicago invokes organizational standing, so it must show an injury to the organization itself. Legal Aid Chicago has standing to challenge the policy of Hunter Properties if and only if it can establish an injury to the organization "in its own right." *See Disability Rts.*, 522 F.3d at 801. Injury to the prospective tenants stemming from the alleged disparate impact of the policy does not suffice to make out an injury to the *organization*, because the prospective tenants are not the organization itself.

10

Legal Aid Chicago alleges a host of injuries stemming from the "No-Evictions Policy" of Hunter Properties. *See* Cplt., at ¶¶ 65–69 (Dckt. No. 1). Legal Aid Chicago contends that the policy harms the organization itself by "frustrating its mission of, and diverting its limited resources from, maximizing low-income Cook County residents' access to safe, decent and affordable housing, including by preventing and reducing the impacts of evictions." *Id*. at ¶ 65.

The complaint gives a long list of activities that Legal Aid Chicago had to do in response to the policy of Hunter Properties. But the list reads like a list of what Legal Aid Chicago does to oppose no-evictions policies generally, meaning policies adopted by landlords in society at large.

Legal Aid Chicago has "had to counteract Hunter's discriminatory actions with the following activities: [1] representing tenants in seeking to seal all types of eviction records (for example, even those that are old or did not result in any judgment against the tenant); [2] providing training and education to tenants, landlords, and others on the harms and discriminatory impact of denying prospective renters on the basis of eviction records; [3] pursuing more cases through to trial so that a tenant can show that they won their eviction case; [4] resolving threatened evictions when tenants receive a notice of termination of tenancy prior to an eviction case being filed; and [5] investigating and bringing this case against Hunter." *Id.* at ¶ 66.

Legal Aid Chicago "has had to use staff time and financial resources to obtain information through Freedom of Information Act requests to assess the discriminatory harm caused by Hunter's actions." *Id.*

Legal Aid Chicago alleges that it would have devoted more resources to promoting its mission and representing tenants in eviction cases, if not for the "No-Evictions Policy" imposed

by Hunter Properties. *Id.* In a nutshell, Legal Aid Chicago views that policy as a drain on its resources.

From the get-go, one thing jumps out. The allegations of the complaint hover at a high level of abstraction. The complaint is more about Legal Aid Chicago's efforts to fight evictions and no-eviction policies generally, and less about Legal Aid Chicago's dealings with Hunter Properties.

Legal Aid Chicago does not allege that it had any interaction with Hunter Properties, apart from investigating a potential lawsuit. It does not allege that it represented any potential tenant who applied to live in a Hunter Properties apartment. It does not allege that any of its clients were turned down by Hunter Properties for an apartment. It does not allege that it represented any of those potential tenants in eviction court, or tried to get their records sealed. It does not allege that it spent any resources to oppose a decision made by Hunter Properties for any particular would-be tenant, or anything along those lines.

The high level of abstraction is inescapable. Organization A opposes Activity X. Defendant B does Activity X. So Organization A sues Defendant B. What's missing is any real-world allegation that Legal Aid Chicago and Hunter Properties had any interaction, either directly or through a potential tenant.

The theory of standing is that Hunter Properties is engaging in the type of activity that Legal Aid Chicago opposes. So, Legal Aid Chicago believes that Hunter Properties inflicted an injury because it is doing the sort of thing that makes work for Legal Aid Chicago.

The leading case on organizational standing is *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens*, the Supreme Court analyzed the scope of organizational standing under the FHA for a nonprofit that provided housing counseling and referrals. *Id.* at 366.

12

Along with two individual plaintiffs, the nonprofit sued the owner of two housing complexes that had allegedly participated in racial steering in violation of the FHA. *Id.* at 367. The nonprofit, HOME, alleged that the defendant's steering practices frustrated its counseling and referral services, and forced it to "devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379. Importantly, the organization in *Havens* spent resources sending and supporting prospective tenants who dealt with the landlord in question.

The Supreme Court framed the question as whether the defendant had "perceptibly impaired" the plaintiff's ability to provide services. "If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

That is, the nonprofit needed to allege that the landlord's policy of racial steering injured the organization's activities and resources. *Id.* The "impair[ment]" needed to be "perceptibl[e]," not theoretical. *Id.* An impact on its "abstract social interests" in access to housing did not suffice. *Id.*

The Supreme Court ultimately found an injury in fact because the activity "perceptibly impaired" the organization's ability to provide its services and drained the organization's resources. *Id.*

13

Unlike the case at hand, the nonprofit in *Havens* did have a connection and an interaction with the defendant landlord. HOME sent potential tenants to the landlord, and expended resources in doing so.

As Legal Aid Chicago sees things, it is no different than the housing nonprofit in *Havens*. Legal Aid Chicago contends that the no-evictions policy has "perceptibly impaired" Legal Aid Chicago's ability to provide its services and "frustrated" its activities.

The Seventh Circuit has built upon the foundation of *Havens* in a few cases about voting rights. Those cases help to define the boundaries of organizational standing.

In *Crawford v. Marion County Election Board*, the Seventh Circuit held that the Democratic Party had organizational standing to challenge an Indiana election law. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008). Based on the reasoning in *Havens*, the Seventh Circuit held that an Indiana law requiring voters to present a photo ID to vote in person "injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Id.* at 951. The law directly prompted the political party to do something, take action, and consume resources.

Twelve years later, the Seventh Circuit decided *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). In *Common Cause*, voting-rights organizations challenged a law that would have purged certain voters from the Indiana voting rolls. *Id.*

The Court of Appeals held that the groups had standing to challenge the law. The law required the group to reallocate resources at the expense of other activities. *Id.* at 946 ("Indiana's legislation, the Organizations assert, will force them to reduce or eliminate their work in certain areas – voter education, get-out-the-vote efforts, and new registrations – so that they can make

sure existing voters are not tossed off the rolls erroneously and without any notice. Under *Havens,* those are concrete injuries.").

The Seventh Circuit went on to say that if the legislation went into effect, "the Organizations will need to undertake the extra efforts they describe and cease other activities. By adding to their workload, [the law] costs them time and money they would have spent differently or not spent at all." *Id.* at 954.

So a policy that forces an organization to add work to its plate outside of its core mission counts as a concrete injury. *See id.* Doing non-core work affects the ability to do core work.

But adding work that is outside a group's normal mission is not required for organizational standing. The Seventh Circuit stated that "the Supreme Court [in *Havens*] found that the impairment of its ability to do work *within* its core mission was enough to support standing." *Id.* (citing *Havens*, 455 U.S. at 379).

So far, that's a broad field of injuries sufficient to support organizational standing. But the Seventh Circuit did limit what counts as a concrete injury. The Court of Appeals explained in *Common Cause* that it was "not . . . say[ing] that organizations have standing based solely on the baseline work they are already doing. They 'cannot convert [ ] ordinary program costs into an injury in fact.'" *Id.* at 955 (citing *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)).

In other words, "[t]he question is what *additional or new burdens* are created by the law . . . . [The challenger] must show that the disruption is real and the response is warranted." *See id.* (citations omitted) (emphasis added).

The Seventh Circuit expanded on this point by looking to several cases from sister circuits. It explained that other courts had not identified an injury where organizations were

burdened with activities "no different from the plaintiffs' daily operations" or activities that do not "inhibit[] daily operations or operational costs beyond normal." *See id.* (citations omitted).

The Seventh Circuit noted that some circuits had rejected standing "where the alleged injury was the provision of training that the organization was already providing" and only the content of that training would change. *See id.* (citing *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–61 (6th Cir. 2014)).

In contrast, an organization *would* suffer an injury if it is forced to "overhaul" its entire strategy or revamp its training materials. *See id.* at 955 (citing *Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016); and then citing *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1242 (9th Cir. 2018)).[1]

Similarly, the plaintiffs in *Common Cause* had standing because the Indiana voter roll purges "force[d] them to reduce or eliminate their work in certain areas – voter education, get-out-the-vote efforts, and new registrations – so that they can make sure existing voters are not tossed off the rolls . . . ." *See Common Cause*, 937 F.3d at 954. The latter activity may have been within its core mission of voting rights, but it was by no means "baseline work." *See id.* at 955.

The Seventh Circuit put an even finer point on the doctrine of organizational standing in *Democratic Party of Wisconsin v. Vos*, 966 F.3d 581 (7th Cir. 2020). That case stemmed from a law passed by the then-Republican-controlled legislature of Wisconsin in response to the election of Democrats as governor and attorney general of the state. *Id.* at 583–84. The law stripped certain powers from the governor and attorney general and vested those formerly executive

---

[1] In *Arizona Alliance for Retired Americans v. Mayes*, 2024 WL 4246721, at *7 (7th Cir. 2024), the Ninth Circuit recently cast doubt on the standing analysis used in *East Bay Sanctuary Covenant.*

powers into legislative committees. *Id.* at 584. In response, the Democratic Party of Wisconsin sued, claiming various constitutional violations. *Id.*

The Seventh Circuit decided that the Democratic Party of Wisconsin lacked standing to challenge the law. *Id.* at 586–87 ("With respect to its effort to support standing on its own injuries, the Party runs into the same problem as the individual plaintiffs. The Acts do not target the Party nor do they formally restrict the Party's ability to raise funds, register voters, get candidates on ballots, or otherwise meaningfully participate in elections.").

Quoting *Common Cause*, the Seventh Circuit explained that "mobilizing voters who are discouraged or apathetic, but not actually impeded in their ability to achieve desired electoral outcomes, is 'baseline work' for a political party; it is an 'ordinary program cost[ ],' not an 'injury in fact.'" *Id.* at 587.

In other words, the Court of Appeals drew a distinction between what had happened in *Common Cause* and what happened in *Vos*. In *Common Cause*, the law actually impeded people from voting, and forced the political party to do something entirely new: prevent voter-roll purges through advocacy before the Secretary of State. *See Common Cause*, 937 F.3d at 957.

In *Vos*, however, voters were not actually deterred from the voting process. Any discouragement injury was merely "psychological." It required the political party to work harder and spend more money within its core body of work: drumming up support among voters. *See Vos*, 966 F.3d at 587.

The upshot of the Seventh Circuit case law is that an organization suffers a concrete injury if it devotes resources to combatting a discrete regulation or policy, at the expense of its other work. *See Common Cause*, 937 F.3d at 954. But the impact must be real and measurable – it must be "perceptible." *See Havens*, 455 U.S. at 379. And an organization cannot allege an

injury in fact based on "baseline" or "ordinary program costs" of the work that it is already doing. *See Common Cause*, 937 F.3d at 955.

In other words, alleging an injury doesn't require a diversion of resources to an entirely different topic. *Id.* at 954. But it does require the organization to have undertaken activities outside its usual or normal work. *Id.* at 955.

That case law from the Seventh Circuit developed in the intervening decades since the Supreme Court's decision in *Havens*. But the Supreme Court recently returned to the issue of organizational standing in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). There, medical associations argued that they had organizational standing to challenge the FDA's decision about mifepristone, an abortion-related drug.

The Supreme Court rejected the notion that the groups had organizational standing. And along the way, the Supreme Court poured some cement around bedrock principles.

An organization does not have standing simply because a defendant has "impaired" its "ability to provide services and achieve their organizational missions." *Id.* at 394. The Supreme Court reaffirmed that a "plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens*, 455 U.S. at 379). Standing cannot exist simply because a defendant frustrates a group's "general legal, moral, ideological, and policy concerns." *Id.* at 386.

The Supreme Court also pumped the brakes on any extension of *Havens*. "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396.

With the table set, this Court turns to whether Legal Aid Chicago has suffered an injury in fact.

Legal Aid Chicago's primary alleged injury is the need to divert resources from its other activities in order to fight evictions and eviction-related housing denials. So the question is whether that is an "ordinary program cost" of the organization, *see Vos*, 966 F.3d at 587, or whether it is an "extra effort[ ]" that "add[s] to their workload," *see Crawford*, 472 F.3d at 954. "Ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing." *See Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001).

Again, Legal Aid Chicago describes its mission as "prevent[ing] evictions and displacement," "ensur[ing] fair access to housing," "maximizing low-income Cook County residents' access to safe, decent, and affordable housing," and "the administration of justice in eviction court." *See* Cplt., at ¶¶ 66, 68 (Dckt. No. 1).

Legal Aid Chicago alleges that the policy of Hunter Properties causes the group to spend more time and resources working on eviction cases, including sealing eviction records and pursuing eviction cases to trial. Those activities look a lot like ordinary expenditures that are part of Legal Aid Chicago's core mission.

It is hard to see how working on eviction cases or sealing eviction records is an injury, let alone a harm caused by the alleged policy of Hunter Properties. It is the very work that Legal Aid Chicago calls its broader mission. An organization's raison d'être is not simultaneously an injury that establishes Article III standing.

Think about it this way: Legal Aid Chicago is like an emergency-room physician. Hunter Properties is creating more patients, with more severe illnesses, for that doctor. That makes the doctor's job harder. The doctor might have to devote more resources of time, energy, and attention to her patients. But that's not a diversion of resources. *See Common Cause*, 937 F.3d at 954.

It's not even "an impairment of its ability to do work *within* its core mission." *See id.* (emphasis in original). It doesn't stop the doctor from doing her job. It is what creates and deepens the need for the job.

Hunter Properties hasn't turned off the lights in the ER or locked a medicine cabinet. In other words, Hunter Properties hasn't done anything that would force the doctor to stop her work and do something well outside her job description before she could resume treating patients. *That* would be an impairment of the doctor's "core mission" of treating patients. *See id.* Merely giving a doctor more patients to treat is not.

Similarly, a streetsweeper is not injured by pedestrians who throw a few candy wrappers on the ground. That extra litter makes the streetsweeper's job harder, but it doesn't impair the streetsweeper's ability to *work toward* his job. It just makes the end goal of clean streets slightly further away. So extra litter wouldn't be an Article III injury for the streetsweeper.

In contrast, a streetsweeper might suffer an injury from drivers who leave their cars parked on the road. Those cars block the streetsweeper from driving and doing his job. And those parked cars would force the streetsweeper to stop and take remedial action – like calling a tow truck – before he can resume his normal work.[2]

---

[2] In *Common Cause*, the state of Indiana suggested that its voter-purge policy "did [Common Cause] a favor, by giving them more of the work they were created to do." *See Common Cause*, 937 F.3d at 953–54. This would be like arguing that the streetsweeper *appreciates* parked cars because the diversion probably means he will have to work more hours (and get paid for those hours). But the Seventh Circuit rejected this argument. Instead, the court focused on the fact that the voter-purge policy distracted and diverted Common Cause from its core mission. *Id.* at 954. And *Vos* sharpened that focus. *See Vos*, 966 F.3d at 587. In short, a defendants' conduct that keeps an organization "in business" through creation of extra work doesn't get the defendant off the hook. If there's otherwise an injury, creating more work isn't somehow a cure-all. At the same time, the mere creation of more work will not be an injury if that work is simply "ordinary program costs." *See Common Cause*, 937 F.3d at 955. Otherwise, a nonprofit organization would always have standing to challenge the conduct it opposes. The Supreme Court has rejected "expansive" theories of standing that would allow plaintiffs to "manufacture [their] own standing." *See Alliance for Hippocratic Med.*, 602 U.S. at 394–95.

The "No-Evictions Policy" is more akin to the candy wrappers than the parked cars. Hunter Properties hasn't targeted Legal Aid Chicago or diverted it from its usual work. *See Vos*, 966 F.3d at 586–87. It simply has made Legal Aid Chicago's core work – litigating eviction cases, pursuing eviction sealings, and educating players in the housing ecosystem about the detrimental impacts of evictions – more necessary, at least in Legal Aid Chicago's casting.

If anything, this case seems even more attenuated than those illustrations. As Defendants point out, causation is lacking, too. The complaint includes no allegation that Legal Aid Chicago dealt directly with Hunter Properties, or spent any resources helping potential tenants who dealt with Hunter Properties. It's like a streetsweeper on the south side of Chicago, suing someone who threw a candy bar wrapper on the street in the north side of Chicago.

The "No-Evictions Policy" also does not "target" Legal Aid Chicago as an organization or formally restrict Legal Aid Chicago's ability to prevent evictions and displacement. *See id.*

Unlike the plaintiffs in *Common Cause*, Legal Aid Chicago does not allege how the policy of Hunter Properties forces it to "reduce or eliminate [its] work in certain areas." *See Common Cause*, 937 F.3d at 954. Legal Aid Chicago alleges that it had to divert resources from its activities generally to seal more eviction records, conduct education and training for tenants and landlords, and pursue more eviction cases to trial. *See* Cplt., at ¶ 66 (Dckt. No. 1).

While Legal Aid Chicago may be shifting resources to work on eviction cases, the complaint lacks allegations about what activities are getting the short end of the stick. That makes it hard to see how Legal Aid Chicago suffered an injury. *See La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, LLC*, 82 F.4th 345, 353 (5th Cir. 2023) ("Of course, shifting resources *to* these efforts seems less likely to give rise to injury without corresponding allegations of what LaFHAC had to shift resources *away from* as a result.") (emphasis in

21

original).  This is especially true because litigating eviction cases is an activity already comfortably within Legal Aid Chicago's "core mission."

The gist of that alleged injury is that the policy of Hunter Properties has forced Legal Aid Chicago to devote more resources to its work representing clients in eviction matters and engaging in advocacy related to housing issues.  In other words, Hunter Properties has made it harder for Legal Aid Chicago to accomplish its mission.  Hunter Properties has a policy, and Legal Aid works to remedy the effects of that policy and similar policies, so Legal Aid Chicago thinks that it is injured when Hunter Properties maintains that policy.

That's not a recipe for standing; it's a few ingredients that don't quite come together.  If that recipe *did* make standing, that would mean any nonprofit organization would have standing to challenge a private party that makes achievement of the nonprofit's end goals more difficult or unlikely.  Standing cannot rely on such abstractions.  *See Spokeo*, 578 U.S. at 340; *Alliance for Hippocratic Med.*, 602 U.S. at 394–95.

At the end of the day, Hunter Properties has not forced Legal Aid Chicago to divert resources from its bread-and-butter mission of legal representation in housing matters.  In fact, its alleged actions are exactly the target of Legal Aid Chicago's work, and its reason for operating.

A conclusory allegation about the diversion of resources does not count, either.  Standing requires a "perceptibl[e]" impact on an organization's resources.  *See Havens*, 455 U.S. at 379.  Incanting the legalese in a complaint is not good enough for subject matter jurisdiction, especially when the allegation is at a high level of generality.

Overall, Legal Aid Chicago has not pled a perceptible impairment of its *ability* to provide its services.  Its allegations are closer to ordinary program costs than to a concrete injury.  In this

case, the injuries really are "simply a setback to the organization's abstract social interest[]" in achieving housing justice. *Id.*

Legal Aid Chicago's theory was already a stretch under *Havens*. But with the Supreme Court's recent expression of caution against reading *Havens* too broadly, Legal Aid Chicago's theory stretches things too far.

One last point is worth noting. Legal Aid Chicago also alleges that it suffered an injury from using staff time and money to "investigat[e] and bring[] this case against Hunter." *See* Cplt., at ¶ 66 (Dckt. No. 1). But that's a cost of litigation. It may not be a direct cost, but it's an opportunity cost. And standing to sue must rest on something more than the cost of suing.

The Supreme Court has squarely rejected the notion that the cost of bringing a lawsuit is an injury that can support standing. *See Steel Co.*, 523 U.S. at 107 ("Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself.").

Standing to bring a lawsuit must rest on something more than the lawsuit itself. An organization may not "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *See Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).

The costs of litigation, such as attorney's fees or lawsuit-related investigation costs, might be recoverable on the back end of a case, but they cannot provide the only injury for standing purposes. "[A]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *Am. Soc. for Prevention of Cruelty to Animals v. Feld*

23

*Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit."). Only investigation costs "incurred prior to" and "unrelated to litigation" constitute an injury. *Steel Co.*, 523 U.S. at 107.[3]

Legal Aid Chicago's conclusory allegations of "us[ing] staff time and financial resources to obtain information through Freedom of Information Act requests to assess the discriminatory harm caused by Hunter's actions" fare no better. *See* Cplt., at ¶ 66 (Dckt. No. 1). These may be pre-litigation investigation costs, but the Court can't quite tell. In keeping with its requirement to draw all reasonable inference in the plaintiff's favor, the Court will assume that Legal Aid Chicago needed to make this assessment for a purpose *other* than litigation.

But without more, the Court has no idea what these FOIA requests were really about. Assessing discriminatory harm from a particular landlord sounds like it may well fall within "ordinary program costs" for Legal Aid Chicago. Any organization needs to figure out how to best allocate its scarce resources to achieve its mission. Just like the "the provision of training

---

[3] There is a small shred of case law to the contrary. A Seventh Circuit case from over three decades ago held that an "investigation into [the defendant's] activities . . . deflected [the plaintiff's] time and money from counseling to legal efforts directed against discrimination" and thus conferred standing. *See City of Chicago v. Matchmaker Real Est. Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992). But the Court sees that holding as foreclosed by the plain language of *Steel Co.*, which rejected standing from litigation costs six years later. *See* 523 U.S. at 107. Further, the Seventh Circuit decided *City of Chicago* before it refined *Havens*'s language about the doctrine of organizational standing. Thirty years later, it is not true that "deflection of the agency's time and money," *City of Chicago*, 982 F.2d at 1095, is all that is needed for an injury. *See Vos*, 966 F.3d at 587 (clarifying that "baseline work" or "ordinary program cost[s]" are not Article III injuries). To the extent that the Seventh Circuit's reasoning was predicated on the existence of *Havens*'s theory of standing, it would no longer be good law. Under that prior, generous standard, it might make sense that litigation costs would be recognized as injury sufficient for standing. But not so now. Otherwise, any party could circumvent standing requirements merely by filing a lawsuit, rendering the holdings in *Crawford*, *Common Cause*, and *Vos* essentially toothless. In fact, the Seventh Circuit has not cited *City of Chicago* for almost twenty-five years.

that [an] organization [is] already providing," *see Common Cause*, 937 F.3d at 955, FOIA requests may be a regular part of Legal Aid Chicago's resource-planning exercises.

The Court needs more meat on the bone before it can find that submitting a few FOIA requests constitutes an Article III injury. *See Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers,* 141 F.3d 71, 78 (3d Cir. 1998) (denying standing for alleged injuries including "a diversion of staff resources" because plaintiffs did not "establish any connection between the investigation and the [defendant's actions] which form the basis for this suit").

And even with more on the bone, that kind of meat may not be enough for standing. The Supreme Court clarified in *Alliance for Hippocratic Medicine* that not all resources spent in opposition to a government policy, such as "drafting citizen petitions . . . [or] engaging in public advocacy and public education" constitute an Article III injury. *See Alliance for Hippocratic Med.*, 602 U.S. at 394. Otherwise, an organization could "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* This line of reasoning applies just as well to Legal Aid's challenge to a private entity's policy here.

To sum it up, Legal Aid Chicago has not sufficiently alleged that it suffered an injury in fact. Without Article III standing, this Court does not have subject matter jurisdiction.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss is hereby granted. The complaint is dismissed for lack of standing.

Date: September 30, 2024          _____

                                 Steven C. Seeger
                                 United States District Judge