UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEGAL AID CHICAGO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 1:23-cv-4809 |
| v. ) | Honorable Steven C. Seeger |
| ) | |
| HUNTER PROPERTIES, INC. ) | |
| ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF LEGAL AID CHICAGO'S MOTION TO ALTER OR AMEND THE JUDGMENT AND FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

Plaintiff Legal Aid Chicago requests that the Court reopen this case and allow it to file its proposed First Amended Complaint ("FAC"), which is attached as Exhibit A to Legal Aid Chicago's motion. This is Legal Aid Chicago's first request to replead. In support, Legal Aid Chicago states as follows.

**Background**

Legal Aid Chicago filed this action against Defendant Hunter Properties, Inc. ("Hunter") on July 25, 2023, alleging that Hunter, which manages more than 2,500 apartments in Chicago, applies a No-Evictions Policy to categorically exclude would-be tenants who have any history of an eviction against them. Dkt. No. 1 ("Compl.") at ¶ 2. Legal Aid Chicago alleges Hunter's No-Evictions Policy disproportionately harms Black people, and especially Black women and their families, and that this discriminatory effect is unjustifiable because it results in the denial of housing even if the eviction case did not result in an adverse judgment, regardless of how long ago the eviction case may have occurred, and irrespective of a tenant's current ability to pay rent or

1

otherwise fulfill the terms of a residential lease. *Id*. at ¶ 2-3. Legal Aid Chicago alleged that Hunter's No-Evictions Policy violates the Fair Housing Act, 42 U.S.C. § 3604(a), by discriminating on the basis of race, Compl. at ¶¶ 72-75, and by discriminating on the basis of race and sex, *id*. at ¶¶ 76-79; and violates the Illinois Consumer Fraud and Business Practices Act, 815 ILCS 505/2, Compl. at ¶ 80-87.

**Hunter's Motion to Dismiss**

Hunter moved to dismiss the Complaint pursuant to Rules 12(b)(1), for lack of standing, and 12(b)(6), for failure to state a claim. Dkt. Nos. 25-26. With respect to its argument that Legal Aid Chicago lacked standing, Hunter contended that Legal Aid Chicago did not adequately allege that Hunter's actions were the proximate cause of its injuries. Dkt. No. 26 at 4-9.

On September 30, 2024, this Court granted the motion to dismiss on standing grounds. Dkt. No. 48 ("Order") at 1. The Court entered judgment pursuant to Federal Rule of Civil Procedure 58 the next day. Dkt. No. 49. In its analysis, the Court stated that to establish organizational standing, Legal Aid Chicago must establish (1) injury in fact; (2) causation; and (3) redressability. Order at 9-10. The Court went on to conclude that Legal Aid Chicago had failed to allege facts sufficient to establish either the injury in fact or causation prongs of the organizational standing requirement. *Id*.

**Proposed First Amended Complaint**

Legal Aid Chicago now seeks leave to file its proposed First Amended Complaint, which cures the pleading deficiencies identified by the Court in its Order. In particular, Legal Aid Chicago includes detailed new allegations (1) regarding its interactions with Hunter; (2) specifying the resources it devoted to helping clients who might have been potential Hunter tenants; (3) detailing the ways Hunter's No-Evictions Policy impeded its Housing Practice Group's core

2

mission of maximizing opportunities for affordable housing for its Cook County clients; (4) explaining the work it had to undertake outside of its normal work as the result of Hunter's No-Evictions Policy; and (5) describing the projects from which it had to divert resources due to Hunter's actions.

## ARGUMENT

The Court should grant relief from the judgment and permit Legal Aid Chicago to file its FAC. The FAC is Legal Aid Chicago's first repleading in this action; the FAC addresses deficiencies the Court raised *sua sponte* in the Order to which Legal Aid Chicago has not had prior opportunity to respond; Legal Aid Chicago has been diligent in submitting this proposed pleading; the amendment will not cause undue prejudice to Hunter; and Legal Aid Chicago has acted at all times in good faith.

**A. Legal standard: post-judgment leave to amend should be granted where the amendments would cure the pleading deficiencies and will not unfairly prejudice the opposing party.**

Because the Court has entered judgment in this case, the proper procedure for Legal Aid Chicago to seek leave to amend its complaint is to file a motion for relief from the judgment under Rule 59(e) and request leave to file an amended complaint pursuant to Rule 15(a)(2). *See Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 528-29 (7th Cir. 2022); *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293, 310 (7th Cir. 2018).

Federal Rule of Civil Procedure 15(a) "provides the standard for evaluating post-judgment motions for leave to amend . . . where a district court enters judgment at the same time it first dismisses a case." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1033 (7th Cir. 2024) (internal quotation marks omitted); *see id*. (the entry of judgment does not "nullify the liberal right to amend under Rule 15(a)(2)"); *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 629 (7th Cir. 2020)

3

(internal quotation marks omitted) ("[W]hen the district court has taken the unusual step of entering judgment at the same time it dismisses the complaint, the court need not find other extraordinary circumstances and must still apply the liberal standard for amending pleadings under Rule 15(a)(2)."). Rule 15(a) states that a court "should freely give leave [to amend] when justice so requires." This Rule "favors amendment as a general matter." *Allen v. Brown Advisory*, LLC, 41 F.4th 843, 853 (7th Cir. 2022).

### 1. Leave to amend is especially appropriate where an action is dismissed on grounds partially raised *sua sponte* and the plaintiff has not previously amended its complaint.

The Seventh Circuit has "repeatedly" held that a plaintiff "should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion ex rel. v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). If the district court denies a plaintiff a first opportunity to amend its complaint, that "decision will be reviewed rigorously on appeal." *Id*. Thus, "leave to amend freely is especially advisable when such permission is sought after the dismissal of the first complaint." *Id*. (internal quotation marks omitted). In fact, leave should be granted "[u]nless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Id*. at 519-20. (emphasis in original); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990). This more liberal standard applies here because this request is Legal Aid Chicago's first to amend its complaint. *See Runnion*, 786 F.3d at 519.

Furthermore, when a court dismisses an action based on issues it raised *sua sponte*, the court should grant leave to amend "because the plaintiff has not received an opportunity to cure the complaint's defect." *James v. Mace*, 2024 WL 4511468, at *2 (7th Cir. Oct. 14, 2024) (citing *Luevano v. Wal-Mart Stores*, 722 F.3d 1014, 1022-23 (7th Cir. 2013)). In this case, Hunter's

motion to dismiss challenged only the causation element of the standing analysis; as the Court noted, Hunter "did not make an argument about the existence of an injury." Order at 10. The Court, however, addressed the injury-in-fact element *sua sponte* because it is "the first step of standing." *Id*. Legal Aid Chicago should be given an opportunity to address the Court's conclusion on injury, particularly where the Court did not find that Legal Aid Chicago could never plead facts to establish an injury-in-fact, only that its allegations in its original complaint were not sufficient. *See James*, 2024 WL 4511468, at *2.

### 2. Legal Aid Chicago's motion for leave to amend is timely and would not cause any unfair prejudice to Hunter.

Leave to amend should be granted unless the plaintiff engaged in undue delay, acted in bad faith or with dilatory motive, or repeatedly failed to cure deficiencies by amendments previously allowed; the opposing party would suffer undue prejudice by virtue of allowance of the amendment; or the amendment is futile. *Foster v. DeLuca*, 545 F.3d 582, 584-85 (7th Cir. 2008). Legal Aid Chicago has moved promptly to seek relief from the judgment within the time set forth in Rule 59. Legal Aid Chicago has not engaged in any delay, bad faith, or dilatory tactics and is not aware of any unfair prejudice that Hunter would sustain by virtue of the requested amendment.

### B. Legal Aid Chicago's proposed FAC will cure the identified pleading deficiencies.

Critically, the proposed FAC cures the deficiencies the Court found with the original complaint. Specifically, Legal Aid Chicago adds allegations in the FAC showing how (1) it learned of Hunter's No-Evictions Policy and expended time and resources investigating Hunter's discriminatory practices; (2) Hunter's No-Evictions Policy directly impairs and interferes with Legal Aid Chicago's Housing Practice Group's ability to perform its core activities because it nullifies Legal Aid Chicago's eviction case work and has compelled Legal Aid Chicago to make substantive changes to its eviction defense and sealing activities; and (3) Hunter's No-Evictions

Policy has required Legal Aid Chicago to take on new and different services beyond its core activities. *See* FAC, Section IV.

### 1. Legal Aid Chicago's connections and interactions with Hunter Properties.

In the Order, the Court determined that Legal Aid Chicago's allegations did not meet the causation element of standing because "Legal Aid Chicago does not allege that it had any interaction with Hunter Properties apart from investigating a potential lawsuit." Order at 12, 21 ("The complaint includes no allegation that Legal Aid Chicago dealt directly with Hunter Properties or spent any resources helping potential tenants who dealt with Hunter Properties."). The FAC now makes clear that Legal Aid Chicago first learned of Hunter's No-Evictions Policy in August 2021 and thereafter undertook an investigation—including sending multiple housing testers to contact Hunter to inquire about rental units—to test whether the policy existed. FAC, ¶¶ 58-67.

In particular, Legal Aid Chicago now alleges that around August 2021, Legal Aid Chicago first learned of Hunter's aggressive No-Evictions Policy of categorically denying rental housing to applicants based on any prior eviction filing. FAC, ¶ 58. Legal Aid Chicago had previously dealt with Hunter when it defended several clients from evictions from Hunter's properties. FAC, ¶ 59. Legal Aid Chicago understood that Hunter's housing units were generally affordable to Legal Aid Chicago's client based and located in more resource-rich, integrated areas of Chicago. FAC, ¶ 59.

Upon learning of Hunter's No-Evictions Policy, Legal Aid Chicago opened a fair housing investigation into Hunter and assigned fair housing testers to inquire about Hunter's evictions screening policies. FAC, ¶ 60. This included expending staff time and resources to review Hunter's rental application materials and policies and assigning multiple fair housing testers to contact Hunter to inquire about Hunter's applications requirements regarding certain rental units. FAC, ¶¶

61-64. Legal Aid Chicago also devoted time and resources to obtain information from community partners and housing counselors familiar with Hunter to assess the discriminatory harm caused by Hunter's actions on Legal Aid Chicago's clients. FAC, ¶ 65.

Based on this investigation and testing, Legal Aid Chicago concluded that all of its clients with prior eviction histories would be categorically denied rental housing under Hunter's No-Evictions Policy. FAC, ¶ 66. This fact nullified the value of Legal Aid Chicago's legal services to those clients and further obligated Legal Aid Chicago to divert scarce resources to counter Hunter's discriminatory policy and practices. FAC, ¶ 67.

### 2. Frustration of Legal Aid Chicago's mission through interference with core tenant representation activities of the Housing Practice Group.

In the Order, the Court noted that "a policy that forces an organization to add work to its plate outside of its core mission counts as a concrete injury," but "the impairment of [the organization's] ability to do work *within* its core mission" can also support standing. Order at 15 (internal quotation marks omitted) (emphasis in original). The proposed FAC now alleges facts showing how Hunter's No-Evictions Policy directly impairs and interferes with Legal Aid Chicago's ability to perform such core activities. Specifically, Hunter's No-Evictions Policy impairs the ability of Legal Aid Chicago's Housing Practice Group's to carry out core tenant eviction defense representation because, even if Legal Aid Chicago secures dismissal of an eviction case or obtains a court order sealing its client's prior eviction record, Hunter will still use the prior eviction filing or sealed record as a basis to deny housing under the No-Evictions Policy. FAC, ¶¶ 68-70.

The Housing Practice Group's mission is to maximize low-income Cook County residents' access to safe, decent, and affordable housing, including by preventing evictions and reducing the impacts of evictions and eviction records. FAC, ¶ 79. Because Hunter uses any eviction record as

7

a basis for categorically denying would-be tenants, Hunter compels Legal Aid Chicago to advise clients about the impact an eviction filing would have on their ability to secure housing even if they are successful. FAC, ¶ 80. This information often leads clients to decide they are better off moving out to avoid acquiring an eviction record, even when they have meritorious defenses. *Id*. When clients choose to move out rather than raise and litigate meritorious defenses, the Housing Practice Group is denied the opportunity to perform its core work of representing tenants in litigation to vindicate their rights and preserve their housing. *Id*. In this way, Hunter's No-Evictions Policy impairs Legal Aid Chicago's ability to do core work within its mission of maximizing low-income tenants remaining in affordable housing. *Id*.

Hunter's No-Evictions Policy also nullifies the Housing Practice Group's work in sealing eviction records and ensuring that such records are not used to exclude tenants from housing. FAC, ¶ 81. Over the last six years, Legal Aid Chicago has devoted its resources and thousands of staff hours to more than 1,100 sealing cases, and by denying housing to those with sealed records, Hunter impedes Legal Aid Chicago's Housing Practice Group's ability to achieve its mission of maximizing housing opportunities for low-income residents. *Id*.

### 3. Diversion of Legal Aid Chicago's resources through other impacts on Housing Practice Group.

In the Order, the Court stated that "[w]hile Legal Aid Chicago may be shifting resources to work on eviction cases, the complaint lacks allegations about what activities are getting the short end of the stick. That makes it hard to see how Legal Aid Chicago suffered an injury." Order at 21. In the proposed FAC, Legal Aid Chicago includes detailed allegations about the activities it was forced to forego due to diverting resources to countering Hunter's actions.

### a. Substantive changes in how core tenant representation is conducted.

As this Court has found, an organization would suffer an injury "if it is forced to overhaul its entire strategy or revamp its training materials." Order at 16 (internal quotation marks omitted). Hunter's policy, and others like it, have compelled Legal Aid Chicago's Housing Practice Group to make such substantive changes to the manner in which its core eviction defense and sealing activities are conducted. FAC, ¶ 71. The FAC also alleges that Hunter's No-Evictions Policy has required it to engage in new services such as advising clients, partners, and the public about possible options for mitigating the impact of eviction records, approaching third-party screening companies to address inaccurate or sealed eviction records, and changing its intake process to specifically ask clients if they have an eviction record and then expending resources on sealing the record and identifying landlords without non-eviction policies. FAC, ¶¶ 75-77.

Other substantial changes in the Housing Practice Group's manner of providing representation include: (1) representing tenants in seeking to seal all types of eviction records, even those that are old or did not result in a judgment against the client; (2) filing and arguing more dispositive motions so that its clients can show that they won their eviction case; (3) informing clients with meritorious claims and defenses that litigating them will not avoid harmful impacts of a judicial eviction record, resulting in clients abandoning meritorious defenses in order to stay out of court; (4) negotiating more time for a tenant to move by forgoing meritorious defenses; (5) expending more time engaging in advocacy work with housing authorities to prevent housing voucher termination; (6) recruiting, training, and managing more volunteers to assist with sealing clients' eviction records; and (7) requiring attorneys to devote more time to non-legal work identifying potential landlords who will rent to clients with eviction records, sending clients information on open waitlists for affordable housing, and speaking with prospective landlords about a client's eviction records. FAC, ¶¶ 71(a)-(g).

### b. Reduced capacity for core tenant representation.

Hunter's No-Evictions Policy has also injured Legal Aid Chicago by forcing it to divert its limited resources at the cost of its planned work and activities. FAC, Section VI. If not for Hunter's No-Evictions Policy, Legal Aid Chicago could have devoted more of its resources to representing more low-income tenants in eviction cases and other housing matters and to otherwise achieving its broader goals regarding the administration of justice in eviction court and maximizing low-income Cook County residents' access to safe, decent, and affordable housing. FAC, ¶ 82. As a result of Hunter's policy, Legal Aid Chicago has diverted its limited resources towards counteracting activities at the expense of other planned non-eviction-related housing work. In particular, Legal Aid Chicago's Housing Practice Group has not been able to dedicate as many resources to: (1) challenging poor housing conditions that pose serious health and safety risks to its clients and their families; (2) challenging unlawful subsidy terminations; and (3) bringing affirmative cases on behalf of tenants, including related to illegal lockouts and rent determinations. FAC, ¶ ¶ 83(a)-(c).

### c. Housing Practice Group forced to take on non-legal services.

This Court noted that "a policy that forces an organization to add work to its plate outside of its core mission counts as a concrete injury," and that "an organization suffers a concrete injury if it devotes resources to combatting a discrete regulation or policy, at the expense of its other work," so long as the resource diversion "require[s] the organization to have undertaken activities outside its usual or normal work," Order at 15, 18. Responsive to this analysis, the FAC alleges that Legal Aid Chicago's Housing Practice Group's attorneys have also been compelled to begin providing non-legal services outside the scope of assisting clients with pending and prior eviction cases. This non-legal work has included: (1) researching and contacting other potential landlords

10

to inquire about their eviction screening policies and practices; (2) assisting clients in completing applications for rental housing; (3) drafting and sending letters to landlords to explain the eviction sealing process and why a previously sealed eviction record has no bearing on an applicant's suitability as a tenant; (4) applying for emergency funds to assist clients to place their property in storage or pay for application fees when they struggle to find housing as a result of prior eviction records; and (5) applying for rental assistance funds on behalf of a client to increase the chance the landlord will agree to settle an eviction case and seal an eviction record. FAC, ¶¶ 76(a)-(e).

### d. Diversion of Legal Aid Chicago's resources forcing housing lawyers to take on consumer protection matters.

Additionally, Legal Aid Chicago has been compelled to combat and mitigate the impact of previously sealed eviction records by providing additional consumer protection services outside of the scope of its core eviction litigation. FAC, ¶ 75. This Court previously determined that Legal Aid Chicago's allegations had not shown Hunter to have "forced Legal Aid Chicago to divert resources from its bread-and-butter mission of legal representation in housing matters." Order at 22. But the Housing Practice Group's new and expanded consumer protection services go well beyond just legal representation in housing matters: (1) advising clients on possible options for mitigating the impact of prior eviction records through consumer protection remedies; (2) drafting and sending letters to and filing formal disputes with third-party screening companies to request removal of inaccurate or sealed eviction records; and (3) developing and distributing public education materials to advise Cook County residents, landlords, and service providers on the enduring impact of eviction records, including those previously sealed, on housing access and the possible options to mitigate that impact though consumer protection remedies. FAC, ¶¶ 75(a)-(c).

### 4. Frustration of Legal Aid Chicago's mission through interference with housing navigation services.

The FAC also details the ways in which Hunter's No-Evictions Policy impairs Legal Aid Chicago's mission of maximizing low-income residents' access to safe, decent, and affordable housing and providing effective housing navigation services and finding housing for its clients. FAC, ¶¶ 73-74, 79-81. For instance, Hunter's policy impedes Legal Aid Chicago's mission by excluding tenants from housing after Legal Aid Chicago has devoted significant resources to having eviction records sealed so that those records will not be used to deny housing. FAC, ¶¶ 72, 82. As a result of the policy and others like it, Legal Aid Chicago's housing navigator must now spend approximately four times longer to secure rental housing for a client with a prior eviction record than a client without a prior eviction record. FAC, ¶ 74.

### 5. Impacts on Legal Aid Chicago's Fair Housing Investigations and Enforcement Project.

The unplanned investigation into the scope and impact of Hunter's No-Evictions Policies significantly exacerbated Legal Aid Chicago's injuries by compelling it to divert the resources of Legal Aid Chicago's Fair Housing Investigation and Enforcement Project. FAC, ¶ 78. That investigation included submitting FOIA requests to get data from the Cook County Sheriff's Office to understand the impact of No-Evictions Policies; appealing the denial of a FOIA request; compiling data and processing into a usable resource that enable mapping of eviction rates across Cook County; analyzing data to determine that No-Evictions Policies have a disparate impact based on race, and on race and sex, in Cook County; educating housing providers about the disparate impact; educating non-profit organizations so that they can best advocate for low-income tenants to secure housing; and developing and conducting presentations and trainings for service providers and community members about tenants' consumer protection rights related to prior

eviction records, tenant screening reports, and the procedures for disputing inaccurate or sealed eviction records appearing on tenant screening reports. FAC, ¶¶ 78(a)-(f).

The Court noted Legal Aid Chicago's allegations regarding use of staff time and resources to obtain information through FOIA to assess the harm caused by Hunter's practices, but found that without more information, the requests may be "ordinary program costs." Order at 24. The FAC details how its injuries were exacerbated when it had to issue FOIA requests to the Cook County Sheriff's Office to obtain data necessary to understand the impact of No-Evictions Policies, including Hunter's. FAC, ¶ 78(a). Legal Aid Chicago had to submit multiple requests and pursue an appeal to get the information. *Id*. It compiled and analyzed the data and determined that No-Evictions Policies have a disparate impact based on race and on race and sex in Cook County. FAC, ¶ 78(c).

Legal Aid Chicago's injuries were further exacerbated when the Fair Housing and Investigation Project's planned activities under a HUD grant to address sexual harassment in housing and housing discrimination against survivors of gender-based violence in Cook County, FAC, ¶ 78, had to be refocused on investigating and fighting Hunter's discriminatory No-Evictions Policy. FAC, ¶ 84. But for Hunter's No-Eviction Policy, the Project would have undertaken additional outreach activities about the protections available for sexual violence and sexual harassment through presentations to tenants' groups and social services organizations, distributing flyers, and social media. FAC, ¶ 84. The Project also would have been able to devote more resources to investigation of complaints of sexual harassment and discrimination against survivors of gender-based violence. FAC, ¶ 84.

13

In sum, the FAC outlines in detail the injuries Legal Aid Chicago has suffered due to Hunter's No-Evictions Policy. The complaint therefore adequately alleges Legal Aid Chicago's organizational standing.

## CONCLUSION

For these reasons, the Court should grant relief from the judgment and permit Legal Aid Chicago to amend and file its First Amended Complaint.

Dated: October 29, 2024

By:/s/ *Brian J. Massengill*

| | |
|---|---|
| Brian J. Massengill | Eric Dunn |
| Brett E. Legner | Katherine E. Walz |
| Megan E. Stride | National Housing Law Project |
| Julia M. Petsche | 90 New Montgomery Street., Suite 1015 |
| MAYER BROWN LLP | San Francisco, CA 94105 |
| 71 South Wacker Drive | Tel: (415) 546-7000 |
| Chicago, IL 60606 | edunn@nhlp.org |
| Tel: 312-783-0600 | kwalz@nhlp.org |
| bmassengill@mayerbrown.com | |
| blegner@mayerbrown.com | *Counsel for Plaintiff Legal Aid Chicago* |
| mstride@mayerbrown.com | |
| jpetsche@mayerbrown.com | |

## **CERTIFICATE OF SERVICE**

      The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on October 29, 2024.

*/s/ Brian J. Massengill*
Brian J. Massengill
