**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LEGAL AID CHICAGO,               )
                                 )
            Plaintiff,           )
                                 )          Case No. 1:23-cv-4809
    v.                           )          Honorable Steven C. Seeger
                                 )          JURY TRIAL DEMANDED
HUNTER PROPERTIES, INC.          )
                                 )
                                 )
            Defendant.           )

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      Plaintiff Legal Aid Chicago brings this suit pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 et seq., and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) for monetary, declaratory, and injunctive relief against Defendant Hunter Properties, Inc. ("Hunter") for engaging in illegal discrimination on the basis of race and on the basis of race and sex, and for engaging in an unfair business act and/or practice, at its more than 2,500 apartments across 60 locations in Chicago.

2.      Legal Aid Chicago provides free legal services to low-income or otherwise vulnerable individuals and families living in Cook County, Illinois. Legal Aid Chicago has a Housing Practice Group, which aims to maximize low-income Cook County residents' access to safe, decent, and affordable housing. It does so by, among other things, defending tenants in eviction cases to preserve existing housing and seeking to seal tenants' prior eviction records under Illinois state law to mitigate the negative effects that eviction records have on housing access. Legal Aid Chicago also provides housing navigation services to its most vulnerable clients, including people who are HIV+ and survivors of gender-based violence. In addition, it

1

works to improve the eviction process so that tenants have a fair chance to present, and have

heard, defenses and counterclaims in eviction court.

3.      On information and belief, Hunter has a discriminatory and unjustifiable "No-

Evictions Policy" that categorically denies rental housing to applicants who have ever been the

subject of an eviction case, regardless of whether the case resulted in an adverse judgment, was

filed many years ago or on unlawful grounds, or involved circumstances (such as

unemployment) that are no longer applicable.[1] Hunter's policy is so broad that even tenants

whose eviction cases were never pursued or who have won their eviction cases will be

automatically denied. Under Hunter's policy, the eviction filing *alone* is an automatic basis for

denial, regardless of the ultimate outcome.

4.      On information and belief, Hunter implements its No-Evictions Policy by

seeking and considering even information about eviction records that have been "sealed"—i.e.,

removed from the public docket—by court order. Under Illinois law, a court has the discretion

to seal records of an eviction case on a showing that it is "sufficiently without a basis in fact or

law, which may include a lack of jurisdiction, that placing the court file under seal is clearly in

the interests of justice, and that those interests are not outweighed by the public's interest in

knowing about the record." 735 Ill. Comp. Stat. Ann. 5/9-121(b). When applied as intended,

this sealing law can chip away at the harmful impact of an eviction record. However, even

---

[1] In this Complaint, we use the term "No-Evictions Policy" to encompass the policies and practices of Hunter that categorically reject prospective tenants with any connection to a past eviction, including, for example, those who: (1) respond affirmatively to an application question about prior eviction (without Hunter defining what counts as "eviction" or providing an opportunity to explain the circumstances of the "eviction"); (2) are identified by a tenant screening service as having a prior eviction case or filing (even where that report is based on erroneous information, out-of-date records that should no longer be transmitted pursuant to federal law, or records that a court ordered to be sealed); or (3) are identified by other similar practices (e.g., contacting prior landlords) as having a connection to a past eviction.

2

when an eviction record is sealed, Hunter appears to find ways to learn about and deny housing based on those eviction cases anyway.

5. Hunter's online housing application requires prospective tenants to answer "yes" or "no" to the question, "Have you ever been evicted?," without providing any explanation of what being evicted means, without stating any exception for long-ago filings or sealed eviction records, and without providing any opportunity to explain surrounding circumstances, present mitigating information, or appeal a denial. On information and belief, Hunter denies housing to all applicants who answer "yes" to that online question.

6. In addition, Hunter engages tenant screening services to provide background checks that screen applicants based on past eviction records, which sometimes include sealed records, without oversight or review of the activities of those services. Hunter then denies housing to all applicants who are matched to eviction records by the third-party tenant screening company.

7. Hunter's No-Evictions Policy has directly impaired Legal Aid Chicago's mission and core activities and injured it in the following ways: (1) by nullifying the effectiveness of Legal Aid Chicago's eviction defense because it has been forced to make substantive changes to its eviction defense services; (2) by nullifying sealing services because Hunter's actions have rendered those services meaningless; (3) by impairing its housing navigation services because Hunter's generally affordable housing in safe and desirable neighborhoods is no longer available to a large swath of clients; and (4) by impairing Legal Aid Chicago's legal services because Legal Aid Chicago has been forced to take on new/non-core activities, both legal and non-legal, to adequately serve clients.

8. Because Black people, and Black women in particular, are significantly more likely to be sued in an eviction action than their white counterparts, Hunter's No-Evictions Policy disproportionately excludes Black people, and particularly on Black women, from rental

3

housing. Just as restrictive racial covenants and the redlining of Black neighborhoods were the cornerstones of housing discrimination in the 20th century, the exclusion of tenants with eviction records today reinforces and expands widespread discrimination in housing. These practices have had, and continue to have, a profound impact on creating and sustaining racial segregation throughout Cook County.

9. Moreover, there is no substantial, legitimate, or non-discriminatory justification for the No-Evictions Policy, which routinely deters, denies, and categorically excludes applicants with prior eviction records who would otherwise be successful tenants. Any legitimate purpose Hunter seeks to accomplish by applying its No-Evictions Policy could be achieved through less discriminatory alternatives, such as conducting an individualized assessment of each potential tenant.

## **PARTIES**

10. Plaintiff Legal Aid Chicago is an Illinois legal aid organization that provides free legal services to low income or otherwise vulnerable individuals and families primarily living in Cook County, Illinois, including, but not limited to, seniors, veterans, people living with HIV, gender-based violence survivors, and human trafficking victims. Legal Aid Chicago has a Housing Practice Group with the mission to maximize low-income Cook County residents' access to safe, decent, and affordable housing.

11. Defendant Hunter Properties, Inc., is an Illinois corporation with its headquarters at 2057 W. Addison St., Chicago, IL 60618. Hunter manages more than 2,500 apartments across 60 locations in Chicago. The apartments managed by Hunter are affordable to low-income tenants in Cook County and are located in safe and integrated neighborhoods. Hunter continuously conducts business in Illinois through its management of rental housing units, and this case arises out of Hunter's contacts with Illinois.

4

## JURISDICTION

12.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 2202, and 42 U.S.C. § 3613(a).

13.     This Court has supplemental jurisdiction over Legal Aid Chicago's state law claim under 28 U.S.C. § 1367.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the claims arose in this District, Hunter is incorporated in this District, and a substantial part of the events giving rise to this action occurred in this District. The principal parties and witnesses are also located in this District. *See* 28 U.S.C. § 1391(b)(1).

## FACTS

I.     **Legal Aid Chicago's Housing Practice Group Focuses its Activities on Eviction Defense and Tenant Advocacy.**

15.     Legal Aid Chicago's Housing Practice Group's mission to maximize low-income Cook County residents' access to safe, decent, and affordable housing has two components: (1) preserving existing housing when housing is both "safe" and "decent" and (2) advancing housing mobility for clients who wish to move *to* safer and decent housing, and *to* integrated neighborhoods with greater access to resources (such as employment and transit) – housing and neighborhoods that Hunter Properties, in particular, offers. In other words, LAC is committed to advancing housing stability, mobility, and access for low-income and vulnerable renters.

16.     To fulfil this mission, Legal Aid Chicago's Housing Practice Group engages in core business activities of providing legal representation to low-income tenants in housing-related matters, promoting fair access to housing, providing housing navigation services to its most vulnerable clients, and advancing equal administration of justice in the Cook County eviction court system.

5

A.    *Legal Services to Preserve and Secure Housing*

17.    The housing-related legal services that Legal Aid Chicago's Housing Practice Group provides to low-income tenants include, but not limited to, providing legal representation to tenants facing eviction; sealing prior eviction records to eliminate future barriers to housing; representing tenants to improve unsafe housing conditions; assisting tenants in obtaining reasonable accommodations in housing; helping tenants to preserve housing subsidies; bringing affirmative cases on behalf of tenants, including related to illegal lockouts and rent determinations, and other landlord/tenant disputes.

18.    Legal Aid Chicago's Housing Practice Group represents hundreds of clients in eviction matters each year.

19.    Legal Aid Chicago's Housing Practice Group represents tenants in eviction cases at all stages, beginning with the service of a notice of termination or court summons, through motion practice and the discovery process, and continuing to trial and appeals. Legal Aid Chicago's staff litigates these cases, including investigating the facts, evaluating the merits of a case, identifying defenses and counterclaims, negotiating with landlords and the eviction plaintiffs' bar to avoid evictions, and going to trial.

20.    Subsidized housing is a particular focus of Legal Aid Chicago's eviction defense practice. For tenants in subsidized housing units, the legal issues are often more complicated because of the complex rules and regulations relating to subsidy programs. And the consequences of an eviction are often more dire; many subsidized housing tenants become homeless when they lose their subsidized housing.

21.    Legal Aid Chicago also provides a number of services through the Comprehensive Legal Assistance for Survivors Project ("CLASP"). Among its services, CLASP protects survivors of domestic violence and sexual assault against the loss of their housing. Frequently, CLASP represents survivors who are being threatened with eviction, or

have had an eviction proceeding filed against them, because of their status as survivors or the violent crimes committed against them. In one study, residents of Black neighborhoods who were experiencing domestic violence were over three times more likely to be threatened with eviction than residents of white neighborhoods who were experiencing domestic violence.[2]

22.    Legal Aid Chicago has contracts to provide these eviction defense services to low-income Cook County residents. This includes being referred cases by housing court to provide eviction defense.

23.    The demand for eviction defense services dramatically exceeds Legal Aid Chicago's capacity. Legal Aid Chicago's eviction defense practice represents, on average, approximately 450 tenants each year. Approximately 30,000 eviction cases are filed in Cook County each year.

24.    Because no-evictions policies including Hunter's mean that Cook County residents are deterred and denied housing, including from Hunter's 2,500 apartments, Legal Aid Chicago also expends significant resources to assist clients in having their eviction records sealed and to educate advocates, lawyers, and tenants on Illinois eviction sealing laws.

25.    Illinois law permits tenants to seal their eviction records in certain limited circumstances. Under an Illinois statute, 735 ILCS 5/9-121(b), a court has discretion to place the court's records under seal upon finding that the case lacked a basis in fact or law, that placing the records under seal is in the interests of justice, and that these interests are not outweighed by the public's interest in knowing about the case. Because sealings under

---

[2] Matthew Desmond & Nicol Valdez, *Unpolicing the Urban Poor: Consequences of Third-Party Policing for Inner City Women*, https://scholar.harvard.edu/files/mdesmond/files/desmond.valdez.unpolicing.asr__0.pdf.

Subsection (b) are not mandatory or automatic, Legal Aid Chicago spends considerable time arguing that its clients' eviction records are eligible for sealing.[3]

> B.    Increasing Access to Fair Housing

26.    Legal Aid Chicago also operates a Fair Housing Investigation and Enforcement Project, for which it has a grant from the United States Department of Housing and Urban Development ("HUD"). Its team of eight attorneys, two paralegals, and a fair housing coordinator fight cases of alleged discrimination, including conducting investigations into landlords' housing practices, deploying fair housing testers, and filing cases to enforce local, county, state and federal fair housing laws.

27.    Legal Aid Chicago's Fair Housing Investigation and Enforcement Project specifically sought and received a grant from HUD to address sexual harassment in housing and housing discrimination against survivors of gender-based violence in Cook County. Legal Aid Chicago decided to undertake this work because it was regularly contacted by female tenants for assistance with sexual harassment by their housing providers and survivors of gender-based violence for help navigating housing instability resulting from abuse. Legal Aid Chicago receives more complaints about potential housing discrimination than it has the resources to investigate. Legal Aid Chicago sought to expand its ability to meet the housing needs of survivors of gender-based violence and harassment through increasing investigations into complaints, conducting outreach in the community to inform survivors of relevant protections, and educating other organizations on what they could do to better assist this vulnerable population.

---

[3] In certain circumstances, Illinois statute 735 ILCS 5/9-121(c) makes sealing mandatory, including when a tenant was evicted following a foreclosure proceeding against the landlord, or when the eviction occurred during the COVID eviction moratorium. The automatic sealing of COVID-related evictions expired on March 31, 2022. 735 ILCS 5/9-122.

C.      *Housing Navigation*

28.     Legal Aid Chicago dedicates staff hours to providing housing navigation services to assist some of its most vulnerable clients in finding and securing rental housing.

29.     Because Legal Aid Chicago has limited resources to provide such housing navigation services, Legal Aid Chicago strategically deploys its personnel to assist particularly vulnerable clients, such as survivors of domestic violence and people living with HIV.

30.     Housing navigation includes assisting tenants with identifying open and appropriate rental property listings and assisting tenants in completing and submitting applications.

D.      *Advancing Policies that Promote Access to Justice*

31.     In order to be able to better serve its clients, Legal Aid Chicago's Housing Practice Group has also dedicated its limited resources to advancing policies that would improve its ability to accomplish its mission of helping low-income people in Cook County access and maintain safe, affordable, and decent housing, such as improving the administration of justice in eviction court.

## II.    Hunter Implements a Broad No-Evictions Policy.

32.     Defendant Hunter maintains a blanket No-Evictions Policy denying housing based on any prior eviction case, regardless of the circumstances or outcome. This policy has previously been plainly stated on Hunter's website: "Prior evictions filings will result in denial."[4]

33.

---

[4] The screenshots that appear in paragraphs 25-26 of the Complaint show Hunter's online application as of June 27, 2023. *See* https://hunterprop.managebuilding.com/Resident/rental-application/new/apply (accessed June 27, 2023) (highlighting added).

**Terms and Conditions**

Thank you for preparing to submit your application for an apartment with Hunter Properties, Inc. Please read the following information before submitting your application.

All individuals aged 18 or older who intend to live in the apartment must submit a separate application. Hunter Properties, Inc. has a two-step screening process which follows the newly enacted Cook County Just Housing Ordinance and the rules of the Cook County Commission on Human Rights.

Step 1: The first step consists of confirming your ability to pay your rent on time:

Hunter Properties, Inc. will consider your income and employment information; results of a credit check; payment history and any civil judgements; eviction history; rental history and landlord references and other similar information.
Inadequate income or poor credit/payment history will result in denial of the application or will result in a request for a qualified co-signor.
==Prior evictions filings will result in denial.==
==False or misleading statements will result in denial.==

34.     Hunter implements this policy in numerous ways that both deter would-be tenants with past evictions *filings* from submitting applications, and detect and deny applicants who disclose past eviction cases or who are matched to eviction records, including:

    a.    Requiring users of the electronic application form to answer "yes" or "no" to the question "Have you ever been evicted?" without defining "evicted," without stating whether sealed eviction records may be excluded, and without providing any opportunity for an applicant to provide explanatory information or other details about an eviction case. An applicant must answer this question to submit the electronic application—the asterisk shown below indicates that this is a required field for the application—and an untruthful answer also establishes grounds for denial of the application.



    b.   Engaging tenant screening services to provide background checks that search for and screen applicants based on records of past eviction filings, which may include sealed records;

    c.   Requiring all adult household members to complete the rental application and submit to the background screening;

    d.   Requiring an online applicant to disclose the name and phone number of a "current landlord," and also requesting the current landlord's email address, which Hunter may use to inquire about past eviction cases, and

    e.   Charging a rental application fee of $70 per adult household member.

**Application Fee**

**$70.00**

35.    On information and belief, Hunter denies admission to all applicants who answer "yes" to the question "Have you ever been evicted?", who are matched to eviction case records by a tenant screening service, or whose involvement in a prior eviction is discovered through inquiries with past or current landlords.

36.    The wording of Hunter's admission criteria and warnings is broad and ambiguous, and no definitions or explanations are provided for terms such as "evicted," "eviction records," "eviction history," "eviction filings," and "prior evictions." This maximizes the deterrent effect—such as by dissuading would-be tenants with dismissed cases or sealed eviction records from applying, or those with eviction records too old to be reported under the Fair Credit Reporting Act. *See* 15 U.S.C. § 1681c(a)(2) (limiting the reporting of civil suits to within 7 years of the date of entry). Any applicant who fails to disclose a prior eviction case, even if that failure is simply due to the application's ambiguous wording, then faces an

11

independent ground for denial under Hunter's policy against the provision of "false" information.

37.    Moreover, Hunter further deters tenants with any connection to a prior eviction case from applying by collecting an up-front $70 per-adult application fee that is not refunded in the event of a denied application, and by providing no opportunity for an applicant to submit explanatory material or otherwise seek review or reconsideration of a denied application.

38.    On information and belief, the number of applicants Hunter formally denies under its No-Evictions Policy represents a small fraction of the potential tenants with prior evictions (including sealed records) who are effectively foreclosed by the policy from Hunter's housing, despite having sufficient resources to afford it and an interest in living there. Many more never apply because they are deterred by Hunter's public-facing descriptions of its policy and the non-refundable, $70 per-adult application fee.

39.    On information and belief, Defendant Hunter also circumvents Illinois law by obtaining information about sealed eviction records—including by inquiring with applicants' past landlords and by requiring online applicants to answer "yes" or "no" to the question "Have you ever been evicted?", without specifying whether sealed evictions are included—and denying housing to applicants on the basis of those sealed cases.

40.    Although in the course of this litigation Hunter purports that it does not "apply its online rental application terms and conditions without exception," Dkt. 27 at 4, Legal Aid Chicago's own testing, described below, ¶ IV. A., *infra*, shows that Hunter does categorically exclude prospective tenants with any history of an eviction case.[5]

---

[5] To the extent Hunter asserts that after the lawsuit was filed it changed its policy to screen tenants for the 12-month period prior to submission, having no temporal limitation on its denial based on eviction records is just one of the many problems with Hunter's categorical No-Eviction policy, and any claim

41. In addition, on information and belief, for at least the last three years through the present, Defendant Hunter has used third-party tenant screening services provided by companies such as CoreLogic, Inc., TransUnion, RP On-Sight, LLC, and/or Equifax which report consumer information available from credit reporting bureaus and other sources, including eviction records, without oversight or review of their activities or practices by Hunter. Upon information and belief, these reports may include records of previous eviction proceedings that have been sealed by court order.

42. The federal government has sounded the alarm on problematic eviction records screening practices. For example, in November 2022, the Consumer Financial Protection Bureau ("CFPB") issued two reports highlighting the many harmful consequences of using eviction history and tenant screening services in making housing decisions.[6] The CFPB pointed to findings that 22% of eviction court records contained misleading or erroneous information.[7] Because landlords do not have to notify prospective tenants before taking adverse action based on a screening report, the onus is on the prospective tenant to review the report and contest the information it contains.[8] As a result, prospective tenants may be denied housing based on an

---

of a new policy is irrelevant to Legal Aid Chicago's claim for damages. In any event, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted).

[6] *See* CONSUMER FINANCIAL PROTECTION BUREAU, TENANT BACKGROUND CHECKS MARKET REPORT (Nov. 15, 2022) [hereinafter CFPB, TENANT BACKGROUND CHECKS], https://files.consumerfinance.gov/f/documents/cfpb_tenant-background-checks-market_report_2022-11.pdf; CONSUMER FINANCIAL PROTECTION BUREAU, CONSUMER SNAPSHOT: TENANT BACKGROUND CHECKS (Nov. 15, 2022) [hereinafter CFPB, CONSUMER SNAPSHOT], https://files.consumerfinance.gov/f/documents/cfpb_consumer-snapshot-tenant-background-check_2022-11.pdf.

[7] *See* CFPB, TENANT BACKGROUND CHECKS, *supra* note 6, at 1-2; *id.* at 14 n.46 (17 screening companies that CFPB reviewed offered evictions history screening "as part of their standard package or for a relatively small additional fee").

[8] *See* CFPB, CONSUMER SNAPSHOT, *supra* note 6, at 10, 23.

erroneous report of a past eviction of which they are unaware, and in some instances, never learn that the report was the reason for the denial.[9]

43.     The CFPB found that reports of evictions may not reflect the reasons behind the eviction filing or the ultimate disposition of the eviction case.[10] Landlords may initiate evictions as retaliation against tenants who assert their legal rights, tenants who demand repairs, or as an intimidation tactic against sexual harassment victims.[11] Additionally, prospective tenants may have eviction cases that were dismissed, vacated, or sealed that still show up in their tenant screening report.[12]

44.     The U.S. Federal Trade Commission ("FTC") acknowledges these problems with screening reports as well. That agency has filed complaints against screening companies for creating eviction reports without reconciling inaccurate or misleading information. The FTC recognizes the negative and unjustified impact that using such faulty eviction reports has on prospective tenants.[13]

45.     On information and belief, Defendant Hunter applies its No-Evictions Policy when the third-party screening report discloses sealed eviction records, without affording applicants a chance to explain.

---

[9] *See id* at 9-10 ("The FCRA requires landlords to provide an adverse action notice to an applicant if they are denied or required to take on lease terms that are not required of others due to information in a screening report. . . . However, interviews and complaints indicate that landlords do not always provide the legally required adverse action notice. As such, consumers, may be unaware of how to obtain the report used, figure out the reason they were denied, and dispute information that is inaccurate.").

[10] *See* CFPB, TENANT BACKGROUND CHECKS, *supra* note 6, at 29-31.

[11] *See* CFPB, CONSUMER SNAPSHOT, *supra* note 6, at 13.

[12] *See* CFPB, TENANT BACKGROUND CHECKS, *supra* note 6, at 32.

[13] *See* Complaint, *U.S. v. AppFolio, Inc.,* 1:20-cv-03563 (D.D.C.), Filed Dec. 8, 2020 (AppFolio settled with the Federal Trade Commission (FTC) for allegedly failing to check whether court records purchased from a third party and used in tenant screening reports had been sealed).

III. **Hunter's No-Evictions Policy Unlawfully Discriminates Against Black People and Black Women in Cook County.**

A. *National Race and Sex Disparities in Evictions*

46. Black people, and especially Black women, are disproportionally the subject of eviction filings in court. In one national study, Black people made up 19.9% of all adult renters, but 32.7% of all eviction filing defendants. Black renters experienced the highest average rates of eviction filing (6.2%) and eviction judgments (3.4%). By contrast, the average eviction filing rate among white renters was 3.4%, and the average eviction judgment rate was 2.0%. The overrepresentation of Black renters within the population of renters against whom an eviction was filed is particularly pronounced in highly populated counties.[14]

47. Research shows that 1 in 5 Black women will experience eviction in their lifetime, compared to 1 in 15 white women.[15] In addition, families with children are three times more likely to be evicted than families without children, and Black children are twice as likely to experience eviction as white children.[16]

48. HUD's Office of Fair Housing and Equal Opportunity issued guidance on the application of the Fair Housing Act to the screening of applicants for rental housing on April 29, 2024.[17] In its guidance, HUD recognized that "overbroad screenings for eviction history

---

[14] Peter Hepburn, Renee Louis, and Matthew Desmond, *Racial and Gender Disparities among Evicted Americans*, THE EVICTION LAB, December 2020, https://evictionlab.org/demographics-of-eviction.

[15] Jaboa Lake and Leni Tupper, *Eviction Record Expungement Can Remove Barriers to Stable Housing* CENTER FOR AMERICAN PROGRESS (Sept. 30, 2021) https://www.law.nyu.edu/sites/default/files/upload_documents/evictions_collinson_reed.pdf

[16] *See* Emily A. Benfer, *U.S. Eviction Policy is Harming Children: The Case for Sustainable Eviction Prevention to Promote Health Equity*, HARVARD LAW PETRIE-FLOM CENTER (Nov. 2, 2022) https://blog.petrieflom.law.harvard.edu/2022/11/02/pandemic-eviction-policy-children/.

[17] U.S. DEP'T OF HOUS. AND URB. DEV., GUIDANCE ON APPLICATION OF THE FAIR HOUSING ACT TO THE SCREENING OF APPLICANTS FOR RENTAL HOUSING (Apr. 29, 2024), https://www.hud.gov/sites/dfiles/FHEO/documents/FHEO_Guidance_on_Screening_of_Applicants_f or_Rental_Housing.pdf.

may have an unjustified discriminatory effect" because of the staggering race and sex disparities in eviction filings.[18]

49.     As HUD has recognized, facially neutral rental admission policies that categorically deny applicants who have ever been subject to an eviction case, like Hunter's No-Evictions Policy, run the risk of violating the federal Fair Housing Act.

50.     CFPB has recognized that the use of eviction history to deny housing has the largest harmful impact on Black women. According to the CFPB, "Black women are more likely than any other demographic to be evicted, with some evidence suggesting that this holds constant after controlling for failure to pay rent."[19] The CFPB cited to national statistics indicating 15.9% more women are evicted annually than men; Black people experience eviction at rates more that 50% higher than White people, with Black women facing an eviction filing at nearly twice the rate of White women; and 36.3% more Black women than Black men are evicted annually.[20]

### B.   Race and Sex Disparities in Evictions in Cook County

51.     Even greater racial disparities pertain to evictions in Cook County, Illinois. An analysis of data from the Cook County Sheriff's Office commissioned by Legal Aid Chicago, as part of its investigation into the scope and impact of No-Evictions Policies, including that of Hunter, shows that while Black people of all genders make up just 33% of Cook County renters, Black people were approximately 56% of the individuals from September 2010 to March 2023 who were either served with an eviction case by the Sheriff's Office or evicted by the Sheriff's Office pursuant to a judgment. Eviction rates for Black renters are consistently higher than

---

[18] *Id.* at 20.

[19] CFPB, TENANT BACKGROUND CHECKS, *supra* at 34.

[20] Hepburn, et al., *supra* note 14.

16

those for non-Black renters: on average, Black renters in Cook County faced nearly triple the likelihood of experiencing an eviction case than non-Black renters (6.1% vs. 2.3%).

52.     The analysis of Cook County eviction data commissioned by Legal Aid Chicago also showed that Black women experience eviction more frequently than any other group. From September 2010 to March 2023, Black women alone accounted for approximately 33% of those served with an eviction case or evicted by the Sheriff's Office despite making up just 22% of all renters in Cook County. On average, Black women renters faced a likelihood of experiencing an eviction case of 4.9%, compared to just 3.1% for all other renters. Black women experience a substantially higher likelihood both of having an eviction filing without being evicted and also of either having an eviction filing or being evicted than renters who are not Black women.

### C. Disparate Impact of Hunter's No-Evictions Policy

53.     On information and belief, Hunter's apartments attract potential tenants from all across Cook County. The renter population of Cook County is therefore a reasonable proxy for the potential applicant pool for Hunter's apartments that is impacted by the No-Evictions Policy, either by the deterrent effect of Hunter's publicly-available statement of its policy on its website or by Hunter's denial of rental applications from anyone with a connection to a prior eviction case.

54.     Hunter's blanket No-Evictions Policy predictably and actually results in the disproportionate denial of housing opportunities to Black renters in Cook County, and especially Black women, both by deterring them from applying and through the rejection of formal applications submitted.

### D. Less Discriminatory Alternatives than Hunter's No-Evictions Policy

17

55. Defendant Hunter's No-Evictions Policy is an arbitrary and unnecessary barrier to housing, and is not necessary to achieve a substantial, legitimate, non-discriminatory interest. *See* 24 C.F.R. § 100.500.

56. A policy or practice that has a discriminatory effect on Black renters, and especially Black women, violates the FHA unless the policy or practice is necessary to achieve a substantial, legitimate, non-discriminatory interest of the housing provider. But any valid interest Hunter may have for the No-Evictions Policy could be served by another practice with a less discriminatory effect, such as having a policy that distinguishes based on the circumstances and outcomes of past eviction cases, applying a reasonable lookback period to eviction records (so that old cases with little or no bearing on an applicant's current suitability for the tenancy are not considered), and conducting an individualized assessment of each potential tenant.

57. HUD has issued guidance on the consideration of eviction cases in rental housing applications, stating:

> Screening criteria, such as those related to criminal records, credit, and rental history, may operate unjustifiably to exclude individuals based on their race, color, or national origin . . . [I]n evaluating rental history, housing providers should consider the accuracy, nature, relevance, and recency of negative information rather than having any negative information trigger an automatic denial. For example, records from eviction or related cases in which the tenant prevailed or that were settled without either party admitting fault do not necessarily demonstrate a poor tenant history. Likewise, extenuating or mitigating circumstances may apply (e.g., an eviction was due to unexpected medical or emergency expenses, or a negative reference reflected bias). This is important because non-white households may be more likely to face eviction actions, even for the same housing history as white counterparts.[21]

**IV. Hunter's No-Evictions Policy Injures Legal Aid Chicago by Directly Impairing and Interfering with its Housing Practice Group's Core Activities.**

---

[21] *See* U.S. DEP'T OF HOUS. AND URB. DEV., OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY (FHEO) GUIDANCE ON COMPLIANCE WITH TITLE VI OF THE CIVIL RIGHTS ACT IN MARKETING AND APPLICATION PROCESSING AT SUBSIDIZED MULTIFAMILY PROPERTIES, 6-7 (Apr. 21, 2022).

A. *Legal Aid Chicago Investigated Hunter's No-Evictions Policy After Learning of its Aggressive No-Evictions Policy*

58.     In or around August 2021, Legal Aid Chicago learned of Hunter's aggressive No-Evictions Policy of categorically denying rental housing to applicants based on any prior eviction filing.

59.     Legal Aid Chicago had previously dealt with Hunter when it defended several clients from evictions from Hunter's properties. Based on this prior work, Legal Aid Chicago understood that Hunter's units were generally affordable to its client base and in more resource-rich, integrated areas of Chicago.

60.     Upon learning of Hunter's aggressive No-Evictions Policy, Legal Aid Chicago was compelled to open a fair housing investigation into Hunter and assigned fair housing testers to inquire about Hunter's eviction screening policies and to better understand the scope and impact of Hunter's policies on its clients.

61.     In or around August 2021, Legal Aid Chicago expended staff time and resources to review Hunter's written rental application materials and policies, and confirmed that Hunter instructed potential applicants that prior eviction filings "will result in denial."

62.     In or around August 2021, Legal Aid Chicago assigned a fair housing tester to contact Hunter to inquire about renting an available unit at 5021 N. Damen. During the call, the fair housing tester asked about Hunter's application requirements and told Hunter's representative that she had a prior eviction record from two years ago. Hunter's representative immediately informed the tester that the eviction would be a "problem." Legal Aid Chicago's fair housing tester understood this to mean that Hunter would deny an application from an applicant with a prior eviction record, as described by the tester.

63.     The same month, Legal Aid Chicago assigned a fair housing tester to contact Hunter to inquire about renting a different available unit at 1601 W. Rosemont. During the call,

the fair housing tester asked about Hunter's application requirements and disclosed that she had a prior eviction record. Hunter's representative stated that the caller would likely be denied because of the prior eviction record and that the application fee was non-refundable.

64.     In or around September 2021, the same fair housing tester who originally called Hunter about its available unit at 5021 N. Damen called again, posing as a different prospective applicant with no prior eviction history. Hunter's representative encouraged the caller to submit an application for rental housing.

65.     As part of its investigation, Legal Aid Chicago also used staff time to obtain information from local community partners and housing counseling providers familiar with Hunter to further assess the discriminatory harm caused by Hunter's actions on its clients.

66.     Based on its testing activities and investigation, Legal Aid Chicago concluded that all of its clients with prior eviction histories would be categorically denied rental housing under Hunter's No-Evictions Policy, even if Legal Aid Chicago prevailed in having their eviction cases dismissed or sealing their prior eviction records because they were "without basis in fact or law" in accordance with Illinois state law. 735 Ill. Comp. Stat. Ann. 5/9-121(b).

> B. *Hunter's No-Evictions Policy Directly Impairs Legal Aid Chicago's Housing Practice Group's Core Activities by Nullifying and Undermining Their Effectiveness.*

67.     Hunter's No-Evictions Policy directly impairs and interferes with Legal Aid Chicago's Housing Practice Group's ability to perform its core activities for its clients in Cook County, as well as to meet its contractual obligations under existing grants to provide eviction defense services for low-income Cook County residents.

68.     Even if Legal Aid Chicago secures a dismissal of an eviction case and proves that its client should not face eviction, Hunter will still use the prior eviction filing (that did not result in a judgment, due to Legal Aid Chicago's efforts) as a basis to deny rental housing to the client under its No-Evictions Policy.

20

69.     Even if Legal Aid Chicago successfully obtains a court order sealing its client's prior eviction record, because it proved that there was no basis in law or fact for the eviction filing, Hunter will still use the sealed eviction record as a basis to deny rental housing to the client under its No-Evictions Policy.

70.     As a result, Hunter's No-Evictions Policy renders Legal Aid Chicago's core eviction defense and sealing activities futile and ineffective in maximizing housing stability, mobility, and access for its clients in Cook County.

71.     Hunter's No-Evictions Policy has compelled Legal Aid Chicago's Housing Practice Group to make substantive changes to its core eviction defense and sealing activities, including:

a.  Representing tenants in seeking to seal *all* types of eviction records (for example, even those that are old or did not result in any judgment against the tenant);

b.  Filing and arguing more dispositive motions so that a tenant can show that they won their eviction case;

c.  Informing clients with meritorious claims and defenses that litigating them in court, even if successful, will not avoid the harmful impacts of a judicial eviction record. With this knowledge, many tenants abandon meritorious defenses in order to resolve threatened evictions when tenants receive a notice of termination of tenancy prior to an eviction case being filed by the tenant moving out or settling with an agreement to seal as part of the settlement;

d.  Negotiating for more time for a tenant to move out by forgoing meritorious defenses and claims in exchange, because once a landlord has filed an eviction, the *filing itself* makes it harder for the tenant to secure new housing because of No-Evictions policies, including Hunter's;

21

  e. Expending more time engaging in advocacy work with housing authorities to prevent voucher termination notwithstanding tenants' inability to move before their voucher moving papers expire, including, requesting extensions on the time to find a new home to use the voucher and/or negotiating with housing authorities to avoid termination.

  f. Recruiting, training, and managing more volunteers to assist with sealing clients' eviction records.

  g. Attorneys taking on non-legal work including identifying potential landlords who will rent to clients with eviction records, sending clients information on open waitlists for affordable housing, and speaking with prospective landlords about a client's eviction record.

  72. Hunter's No-Evictions Policy also impairs the ability of Legal Aid Chicago's personnel to secure housing for its clients.

  73. Legal Aid Chicago dedicates staff hours that provide housing navigation services to assist some of its most vulnerable clients, such as people living with HIV and survivors of gender-based violence, in finding and securing rental housing.

  74. Hunter's No-Evictions Policy directly impairs Legal Aid Chicago's ability to provide effective housing navigation services and find and secure safe housing for these clients. It takes Legal Aid Chicago's housing navigator approximately four times longer to secure rental housing for a client with a prior eviction record than a client without a prior eviction record.

  *C. Hunter's No-Evictions Policy Has Required Legal Aid Chicago's Housing Practice Group to Take on New and Different Services Beyond its Core Activities.*

  75. As a result of Hunter's No-Evictions Policy, Legal Aid Chicago's Housing Practice Group was compelled to provide additional consumer protection services, outside of

the scope of its existing core activities, to combat and mitigate the lasting impact of previously-sealed eviction records on their clients' ability to access housing in Cook County. Legal Aid Chicago's Housing Practice Group's new and expanded legal services include:

    a. Advising clients on the possible options for mitigating the impact of eviction records through consumer protection remedies;

    b. Drafting and sending letters to and/or filing formal disputes with third-party screening companies to request removal of inaccurate and/or sealed eviction records; and

    c. Developing and distributing public education materials to advise Cook County residents, landlords, and service providers on the enduring impact of eviction records (including those that have been sealed) on housing access and the possible options to mitigate that impact through consumer protection remedies.

76. In addition, Legal Aid Chicago's Housing Practice Group attorneys have been compelled to begin providing non-legal services, outside of the scope of its existing core activities, to assist clients with pending and prior eviction cases in accessing housing in Cook County, including:

    a. Researching and contacting other potential Cook County landlords to inquire about their eviction screening policies and practices;

    b. Assisting clients with eviction records in completing applications for rental housing;

    c. Drafting and sending letters to landlords to explain the eviction sealing process, why a previously-sealed eviction record has no bearing on an applicant's suitability as a tenant, and the importance of considering other factors outside of the mere existence of a prior eviction record in reviewing applications for rental housing;

    d.   Applying for emergency funds to assist clients to place their property in storage and/or pay for application fees when they struggle to find housing as a result of prior eviction records; and

    e.   Rather than pursuing meritorious defenses, applying for rental assistance funds on behalf of a tenant to increase the chance a landlord will agree to settle the case and seal an eviction record.

77.    The staff who assisted survivors with housing navigation services were also compelled to change their strategy because No-Eviction Policies, including that of Hunter, caused the housing applications of survivors to be denied due to eviction records. This new strategy included changing the intake process to specifically ask clients if they had an eviction record—including evictions stemming from the violence against them—and, if they did, to expend resources on sealing their record and identifying landlords without No-Evictions Policies.

78.    In exacerbation of its injuries, Legal Aid Chicago's Fair Housing Investigation and Enforcement Project has also been compelled to take on unplanned work as a result of the impact on its clients of Hunter's No-Evictions Policy. Legal Aid Chicago's Fair Housing Investigation and Enforcement Project sought and received a Private Enforcement Initiative grant from HUD to address sexual harassment in housing and housing discrimination against survivors of gender-based violence in Cook County. *See* ¶ I., B., *supra*. However, because No-Evictions Policies, including Hunter's, meant that its clients were unable to secure housing even if Legal Aid Chicago was successful in housing court, Legal Aid Chicago's Fair Housing Investigation and Enforcement Project was compelled to undertake an unplanned investigation into the scope and impact of No-Evictions Policies, and to use the information learned to inform its work on behalf of low-income Cook County tenants, including:

a.  Submitting Freedom of Information requests to get data from the Cook County Sheriff's Office that was necessary to understand the impact of No-Evictions Policies, including Hunter's. Because the Cook County Sheriff's Office did not want to release some data, this required multiple requests and an appeal.

b.  Compiling Sheriff's Office data and turning it into a usable resource that enables mapping of eviction rates across the County.

c.  Analysing Sheriff's Office data to determine that No-Evictions Policies, including Hunter's, have a disparate impact based on race and on race and sex in Cook County.

d.  Educating housing providers that No-Evictions Policies have a disparate impact based on race and on race and sex in order to encourage landlords to use individualized assessments rather than No-Evictions Policies.

e.  Educating other non-profit organizations, including organizations that provide rental housing counseling and navigation services, so that they too could understand the enduring impact of eviction records on tenants' ability to access housing and use it to inform how to best advocate for low-income tenants to secure housing.

f.  Developing and conducting presentations and trainings for service providers and community members about tenants' consumer protection rights related to prior eviction records, tenant screening reports, and the procedures for disputing inaccurate and/or sealed eviction records on tenant screening reports.

**V.  Hunter's No-Evictions Policy Injures Legal Aid Chicago by Frustrating the Mission of its Housing Practice Group.**

79.    Hunter's No-Evictions Policy injures Legal Aid Chicago by frustrating the mission of its Housing Practice Group—i.e., to maximizing low-income Cook County

25

residents' access to safe, decent and affordable housing, including by preventing and reducing the impacts of evictions and eviction records.

80.     By using any eviction record as a basis for categorically denying would-be tenants, Hunter's No-Evictions Policy frustrates the mission of Legal Aid Chicago's Housing Practice Group to prevent evictions and to ensure fair access to safe and affordable housing. Because of Hunter's No-Eviction Policy, Legal Aid Chicago is compelled to advise clients facing the possible threat of a soon-to-be filed eviction case—even those who would ultimately succeed in defending against such a case—about the impact an eviction filing would have on their ability to secure new housing even if they are successful in the eviction proceeding. Upon hearing this information, clients often decide they are better off moving out to avoid acquiring an eviction record, even though they have valid defenses—for example, reasonable accommodation defenses or defenses based on being a survivor of domestic violence—and would prefer to remain in their homes. Hunter's No Eviction Policy thus interferes with the Housing Practice Group's mission to maximize low-income tenants remaining in affordable housing.

81.     By using sealed records as a basis for categorically denying would-be tenants, Hunter nullifies the work of Legal Aid Chicago's Housing Practice Group to seal eviction records and ensure that such records are not used to exclude tenants from housing. Over the last six years, Legal Aid Chicago has devoted its resources and thousands of staff hours to more than 1,100 sealing cases. Even the simplest cases, where the landlord does not oppose sealing, can take as many as ten hours of attorney time. Difficult, contested cases require far more resources. By denying housing to those with sealed records, Hunter impedes Legal Aid Chicago's Housing Practice Group ability to achieve its mission of maximizing housing opportunity for low-income Cook County residents.

**VI.** **Hunter's No-Evictions Policy Exacerbates Legal Aid Chicago's Injuries by Forcing It to Divert Its Limited Resources at the Cost of Its Planned Work and Activities.**

82.     If not for Hunter's discriminatory, blanket No-Evictions Policy, Legal Aid Chicago could have devoted more of its resources to representing more low-income tenants in eviction cases and other housing matters and to otherwise achieving its broader goals regarding the administration of justice in eviction court and maximizing low-income Cook County residents' access to safe, decent and affordable housing.

83.     As a result of Hunter's No-Evictions Policy, Legal Aid Chicago's Housing Practice Group's injuries were exacerbated because it had to divert its limited resources toward counteracting activities at the expense of other planned non-eviction-related housing work. In particular, Legal Aid Chicago's Housing Practice Group has not been able to dedicate as many resources to the following non-eviction-related housing matters:

a.   Challenging poor housing conditions that pose serious health and safety risks to its clients and their families;

b.   Challenging unlawful subsidy terminations; and

c.   Bringing affirmative cases on behalf of tenants, including related to illegal lockouts and rent determinations.

84.     In addition, because Legal Aid Chicago's Fair Housing Investigation and Enforcement Project was compelled by Hunter's No-Evictions Policy to undertake an unplanned investigation into the scope and impact of these policies, Legal Aid Chicago's injuries were also exacerbated because it was left with fewer resources to accomplish the work it planned. In particular, Legal Aid Chicago's Fair Housing Investigation and Enforcement Project would have undertaken additional outreach activities about the protections available for sexual violence and harassment through presentations to tenants' groups and social services organizations, distributing flyers, and social media. It also would have investigated more

27

complaints of sexual harassment and discrimination against survivors of gender-based violence.

85.    All combined, Legal Aid Chicago's injuries have been exacerbated because it has suffered actual damages because of Hunter's No-Evictions Policy, given the economic value of the resources that Legal Aid Chicago was compelled to divert resources to counter Hunter's discriminatory policy and practices. Legal Aid Chicago's mission and core activities of its Housing Practice Group were also directly impacted by Hunter's policy, as alleged further above.

## COUNT I

### Race Discrimination in Violation of the Fair Housing Act

### (42 U.S.C. § 3604)

86.    Legal Aid Chicago realleges and incorporates all foregoing allegations into this section.

87.    The FHA prohibits discrimination in rental housing on the basis of race including by refusing to rent, refusing to negotiate for the rental of property, or otherwise making unavailable or denying a dwelling to a person because of race. *See* 42 U.S.C. § 3604(a).

88.    Hunter's No-Evictions Policy violates 42 U.S.C. § 3604(a) by discriminating on the basis of race. Hunter makes unavailable rental dwellings because it refuses to receive or process applications for the rental of dwelling units, and deters would-be applicants, by stating its policy of categorically refusing applicants with any prior eviction cases. Hunter's policy also denies housing by categorically rejecting applicants based on any connection to a prior eviction and by engaging a third-party tenant screening service without guidance, oversight or review of its practices in obtaining eviction records. This policy has an unjustified disparate impact on Black renters, who are significantly more likely to have been sued in an eviction case than other renters in the pool of potential applicants to Hunter's rental properties. By

following this policy, Hunter disproportionately makes unavailable and denies housing opportunities to Black people in Cook County.

89.     Hunter's No-Evictions Policy is not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## COUNT II

### Race and Sex Discrimination in Violation of the Fair Housing Act

### (42 U.S.C. § 3604)

90.     Legal Aid Chicago realleges and incorporates all foregoing allegations into this section.

91.     The FHA prohibits discrimination in rental housing on the basis of race and sex including by refusing to rent, refusing to negotiate for the rental of property, or otherwise denying a dwelling to a person because of race and sex. *See* 42 U.S.C. § 3604(a).

92.     Hunter's No-Evictions Policy violates 42 U.S.C. § 3604(a) by discriminating on the basis of race and sex. Hunter makes unavailable rental dwellings because it refuses to receive or process applications for the rental of dwelling units, and deters would-be applicants, by stating its policy of categorically refusing to admit tenants with any prior eviction cases. Hunter's policy also denies housing by categorically rejecting applicants based on any connection to a prior eviction and by engaging a third-party tenant screening service without guidance, oversight or review of its practices in obtaining eviction records. This policy has an unjustified disparate impact on Black women, who are significantly more likely to have been sued in an eviction case than other renters in the pool of potential applicants to Hunter's rental properties. By following this policy, Hunter disproportionately makes unavailable and denies housing opportunities to Black women in Cook County.

93.     Hunter's No-Evictions Policy is not necessary to achieve a substantial, legitimate, non-discriminatory interest.

29

## COUNT III

**Unfair Residential Leasing in Violation of the**
**Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2)**

94. Legal Aid Chicago realleges and incorporates all foregoing allegations into this section.

95. Hunter's policy of disqualifying all prospective tenants with any prior eviction, and its broad and far-reaching methods of implementing that policy, is an unfair business practice because the practice offends public policy, is immoral, unethical, oppressive, and/or unscrupulous, and injures consumers.

96. Illinois, along with other states and cities, has passed statutes enabling tenants to seal eviction case records in certain circumstances so as to protect their access to rental housing. *See*, *e.g.,* 735 ILCS 5/9-121 (authorizing eviction record sealing by discretion where "action is sufficiently without a basis in fact or law" and mandating sealing of certain post-foreclosure evictions). Hunter undermines this public policy by inquiring into and denying rental housing because of sealed eviction records, by deterring would-be tenants with sealed eviction records from even applying for its housing, and by engaging a third-party tenant screening service without guidance, oversight or review of its practices in obtaining eviction records.

97. Hunter violates public policy because excluding would-be tenants with any prior eviction cases contributes to housing insecurity and homelessness, contrary to public policies embedded in multiple Illinois laws such as the Homelessness Prevention Act, 310 ILCS 70/1.

98. Hunter's policy and practice of categorically excluding tenants with any prior eviction cases is injurious to tenants because they deter, and deny housing to, would-be tenants who would otherwise live successfully in housing rented out by Hunter.

99.     Because Black renters, and especially Black women, are disproportionately more likely to have been sued in an eviction case, excluding such tenants has discriminatory impacts, contrary to public policies reflected in statutes such as the federal FHA, 42 U.S.C. § 3604, and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*.

100.     A policy excluding tenants based on the existence of any prior eviction case tends to deter tenants with valid defenses to eviction from appearing in court and defending themselves, a dynamic which undermines the right to procedural due process and impedes state courts from hearing, deciding, and according full and proper relief in eviction matters.

101.     Hunter's No-Evictions Policy of excluding tenants with any prior eviction case is immoral, unethical, oppressive, and or unscrupulous because Hunter's policy and practices are designed to deter and exclude, and do deter and exclude, would-be tenants with eviction cases that were dismissed or otherwise resolved in the tenant's favor, that were sealed or otherwise made of limited dissemination, that took place many years ago, that were filed based on the acts or omissions of persons who would not be part of the prospective tenant household, or that otherwise lack meaningful predictive value about the suitability of the would-be tenant.

102.     Accordingly, Hunter's categorical No-Evictions Policy constitutes an unfair act or practice in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

## **PRAYER FOR RELEF**

Wherefore, Legal Aid Chicago requests that this Court:

A.     Declare that Hunter's categorical No-Evictions Policy is unlawful due to its unjustified discriminatory effect on Black renters in Cook County, and on Black women in particular, in violation of Section 3604(a) of the Fair Housing Act;

B.     Declare that Hunter's categorical No-Evictions Policy constitutes an unfair business practice that violates public policy, is immoral, unethical, oppressive, and or

unscrupulous, and is injurious to consumers in violation of Section 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act.

       C.     Permanently enjoin Hunter from continuing its No-Evictions Policy;

       D.     Award Legal Aid Chicago all compensatory or punitive damages to which it may be entitled, as well as the costs of suit, including reasonable attorney fees;

       E.     Award any additional relief that the Court may deem just and appropriate.

Dated: November 5, 2024

By:*/s/ Brian J. Massengill*
Brian J. Massengill
Brett E. Legner
Megan E. Stride
Julia M. Petsche
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-783-0600
bmassengill@mayerbrown.com
blegner@mayerbrown.com
mstride@mayerbrown.com
jpetsche@mayerbrown.com

Eric Dunn
Katherine E. Walz
National Housing Law Project
90 New Montgomery Street., Suite 1015
San Francisco, CA 94105
Tel: (415) 546-7000
edunn@nhlp.org
kwalz@nhlp.org

*Counsel for Plaintiff Legal Aid Chicago*